192 F.3d 144 (D.C. Cir. 1999)
 Kootenai Electric Cooperative, Inc., et al.,Petitioners
v.
Federal Energy Regulatory Commission, Respondent
Public Utility District No. 2 of Grant County, Washington, et al., Intervenors
 No. 98-1275 Consolidated with 98-1367
 United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued September 10, 1999
Decided October 8, 1999
 
 On Petition for Review of Orders of the Federal Energy Regulatory Commission
 Peter C. Kissel argued the cause for petitioners Kootenai Electric Cooperative, Inc., et al. With him on the briefs was Alan I. Robbins.
 Howard E. Shapiro argued the cause for petitioner The Grant County Purchasers Group and intervenor The Snake River Power Association, Inc. With him on the briefs were Gary D. Bachman and Adelia S. Borrasca.
 Adelia S. Borrasca argued the cause and was on the brief for intervenor The Snake River Power Association, Inc.
 Laura J. Vallance, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were Douglas W. Smith, General Counsel, Jay L. Witkin, Solicitor, and Susan J. Court, Special Counsel.
 William J. Madden, Jr. and John A. Whittaker, IV were on the brief for intervenor Public Utilities District No. 2 of Grant County, Washington.
 Before: Wald, Silberman, and Tatel, Circuit Judges.
 Opinion for the Court filed by Circuit Judge Silberman.
 Silberman, Circuit Judge:
 
 
 1
 Two groups of petitioners seek review of the Federal Energy Regulatory Commission's (FERC's) order authorizing the future licensee of a hydroelectric project to charge a market price for 30% of the project's power. We deny the petition.
 
 I.
 
 2
 The Priest Rapids Project is a federally licensed hydroelectric development located in Grant County, Washington; the current licensee, Grant County Public Utility District (Grant), has held the license since 1955. Grant entered into long-term contracts with one group of petitioners--the purchasers group--to provide them with 63.5% of the Project's firm power at a price determined by a cost-based formula. While both those contracts and Grant's license expire in 2005, Grant expects its license to be renewed, and has entered into contract negotiations for post-2005 power sales with the purchasers group on the basis of that expectation.
 
 
 3
 This case arises from Grant's decision not to negotiate with the second group of petitioners--the Idaho cooperatives-over the sale of power following relicensing. This rebuff led the Idaho cooperatives to file a complaint with FERC alleging that Grant had failed to comply with the 1954 Act authorizing construction of the dam. The Act, in relevant part, requires that the licensee offer "a reasonable portion of the power output of the project for sale within the economic marketing area in neighboring States and ... cooperate with agencies in such States to insure compliance with this requirement," in order to "assure that there shall be no discrimination between States in the area served by the project." See Pub. L. No. 544, 6, 68 Stat. 573, 574 (1954). The Idaho cooperatives sought an order requiring Grant to sell them approximately one-fifth of the Project's output, pursuant to FERC's authority under the Act to, "in the event of disagreement between the licensee and the power marketing agencies[,] determine and fix the applicable portion of power capacity and power output to be made available hereunder and the terms applicable thereto."
 
 
 4
 The purchasers group and Grant opposed the Idaho cooperatives' request, each claiming that the issue of allocation of power following relicensing would not be ripe until relicensing had occurred. The purchasers group also noted that their contracts with Grant provided them a right of first refusal to Project power that would be jeopardized by the cooperatives' desired relief, while Grant contended that the Act would not apply upon relicensing. FERC concluded that the Act would apply upon relicensing, and set the matter for a trial-type evidentiary hearing before an ALJ. See Kootenai Elec. Coop., Inc., et al. v. Public Util. Dist. No. 2, 72 FERC p 61,222 (1995). The Commission decided that the case was ripe, noting that Grant and the purchasers group were already engaged in negotiations for post-relicensing power sales. See id. at 62,032-33, reh'g denied, 73 FERC p 61,307 at 61,858 (1995). Meanwhile, intervenor Snake River Power Association, a marketing agency selling power in the States of Idaho, Montana, Utah, Nevada, and Wyoming, entered the case to stake its claim to a post-relicensing allocation of power.
 
 
 5
 The ALJ, without much discussion, decided that 30% of the Project's firm power should be sold to power marketing agencies serving Idaho, Oregon, and Montana, and fixed a percentage allocation for each party to the proceeding based upon the number of retail customers they would likely serve following relicensing. He noted that the Act requires sales to Washington's "neighboring States," and while no States but Idaho and Oregon directly border Washington, Montana is sufficiently mentioned in the legislative history that it should be deemed neighboring for purposes of the Act.
 
 
 6
 The Commission upheld the ALJ's finding that a 30% allocation would satisfy the statute's "reasonable portion" requirement,[1] noting that the percentages proposed by the parties were self-serving and that "nothing ... proscribes the Commission's discretion in determining what is a 'reasonable' portion." Kootenai Elec. Coop., Inc., et al. v. Public Util. Dist. No. 2, 82 FERC p 61,112 at 61,402 (1998). However, FERC, explaining that division of the allocation among the purchasers using any of the proposed numerical formulas would be "inherently arbitrary and fundamentally inconsistent with the Commission's policy of promoting competition," decided that the future licensee would be required to allocate the power using a non-discriminatory market mechanism-i.e., market pricing--with petitioners given first crack at purchasing the power. Id. Without deciding what "neighboring States" meant, the Commission broadened the geographic scope of sales to include those States serviced by Snake River Power Association, reasoning that the Act's purpose would be best served by distributing power within the broader "economic marketing area."
 
 
 7
 None of the parties was completely satisfied with this order, and all requested a rehearing, with three different views as to which states qualify as "neighboring States" and four different views as to the appropriate allocation. All petitioners argued that use of a market mechanism is inconsistent with the Act, which they claim requires both that the power be sold at cost and that the Commission allocate the power itself. It was also claimed that their right of first refusal would be meaningless if the power were sold at a market price. Grant, which expects to be the future licensee, of course did not join in this argument, but rather asked the Commission to decrease the amount of power the licensee would be required to sell (Grant appears before us as an intervenor in support of respondent). The Commission denied rehearing. See Kootenai Elec. Coop., Inc., et al. v. Public Util. Dist. No. 2, 83 FERC p 61,289 (1998).
 
 
 8
 We consolidated separate petitions for review by the purchasers group and the Idaho cooperatives. Though their arguments differ in certain respects, both claim that the 1954 Act forbids use of a market mechanism to allocate the Project's power, and that respondent did not engage in reasoned decisionmaking when it selected 30% as the reasonable portion of power to be allocated; the Idaho cooperatives alone ask us to review the proper geographic scope of power distribution, i.e., the scope of the term "neighboring States."In addition to defending its order on the merits, the Commission asserts that petitioners lack standing and that this case is not ripe.
 
 II.
 
 9
 We start, as of course we must, with the Commission's jurisdictional objections. FERC argues that the case is not ripe because the new license has not been awarded and one cannot know now what price the new licensee--Grant or another entity--would charge any purchaser. Petitioners cry foul; after all, they argue, FERC itself determined the controversy was ripe before it. But whether or not an agency determines a proceeding is "ripe" for its purposes, that conclusion is not determinative when the question is ripeness in a federal court. See Pfizer Inc. v. Shalala, 182 F.3d 975, 979-80 (D.C. Cir. 1999). An agency is not bound to observe such judicial strictures, either constitutional or prudential, as are Article III courts. See id.
 
 
 10
 Nonetheless, we think the case is ripe for the same reasons that persuaded FERC when it was acting as an adjudicator. Although it is possible that another entity would be awarded the license rather than Grant, that contingency, as a practical matter, is too remote to trouble us. So too is the possibility that the market price for power would sink to a cost-based price. The important point is that the petitioners and Grant have entered the negotiation stage for post-relicensing power, and their respective bargaining power would be substantially altered if FERC's decision were reversed. Cf. Associated Gen. Contractors v. Coalition for Economic Equity, 950 F.2d 1401, 1407 n.5 (9th Cir. 1991) (challenge to minority business preference ripe where contractors' bidding decisions would differ depending upon resolution of issue); Fort Sumter Tours v. Andrus, 564 F.2d 1119, 1123-24 (4th Cir. 1977) (challenge to denial of statutory preference ripe where denial affected negotiations for tour concession).
 
 
 11
 Moreover, the question presented is in Abbott Laboratories terms "purely legal," and any decision we reach can hardly be thought of as interfering with agency deliberations; the Commission has finally determined the issue. See Abbott Laboratories v. Gardner, 387 U.S. 136, 149 (1967); cf. Weinberger v. Salfi, 422 U.S. 749, 765 (1975). We therefore conclude the case is ripe.
 
 
 12
 The standing issue, after oral argument, actually disappeared. The Commission had challenged petitioners' standing to protest the reasonableness of the allocation percentage and the Commission's failure to define "neighboring States."But petitioners freely admitted that if market pricing is legitimate they would have no particular interest or stake in the amount of power allocated to "purchasers," wherever they are. Power is fungible, and the output of the Priest Rapids project would have a trivial impact on the national market price. Since we determine that the Act does not preclude the Commission's market-rate authorization, the petitioners' alternative claim is abandoned and therefore we never get to their standing to raise it.
 
 III.
 
 13
 We are brought then to the core issue. Does this rather unusual statute require the Commission to set cost-based rates for the portion of the power Priest Rapids produces that is to be allocated to purchasers in neighboring states?[2] In the administration of the basic Federal Power Act, FERC has since moved to a market-rate deregulatory posture.[3] And as the parties recognize, FERC actually lacks authority to set the rates of state utilities under the FPA. See 16 U.S.C. § 824(f); Village of Bergen v. FERC, 33 F.3d 1385, 1387 (D.C. Cir. 1994). Petitioners' argument is that the special statute governing the construction of this project implicitly granted FERC rate-making authority; indeed obliges FERC to exercise that authority notwithstanding the exemption for state utilities under the FPA, and notwithstanding the present deregulatory regime.[4]
 
 
 14
 Nothing in the actual language of the Act explicitly requires FERC to set cost-based rates--or any other kind of rates--but petitioners contend that the legislative history is instructive and there is language in the statute that necessarily implies a congressional intent to require FERC to set cost based rates if the parties disagree. Petitioners never make clear whether they are claiming that the congressional intent is so specific that the case should be treated as a Chevron step I candidate, see Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), or whether they only contend that under Chevron step II the agency's interpretation is unreasonable. Be that as it may, petitioners rely primarily on the legislative history.
 
 
 15
 There is no question that the legislative deliberations reflect a general understanding that the project would provide low-cost power to the Northwest. See, e.g., 100 Cong. Rec. 10,215 (daily ed. July 10, 1954) (statement of Sen. Magnuson) ("When we talk about more kilowatts for the Northwest, we also have in mind cheap kilowatts."); 100 Cong. Rec. 6,850 (daily ed. May 19, 1954) (statement of Rep. Angell) ("[T]he power will be distributed equitably throughout the areas as is now the case under Federal procedure."); Priest Rapids and Cougar Hydroelectric Projects: Hearings on S. 1743 and S. 2920 Before a Subcomm. of the Comm. on Public Works, 83d Cong., 2d Sess. 12 (May 20, 1954) ["May 20th Hearings"] ("The effect of the House language is to insure ... that neighboring States get a fair share of the benefits produced by the licensee in this stretch of the river."). That understanding was premised, however, on governing state rate regulations that were and are typically cost based. Indeed, Congress assumed that the licensee as a non-profit agency would be obliged to sell at cost.[5] This assumption, however, may no longer be accurate, since Grant informs us that it has been selling excess power at market prices. A congressional assumption about an existing state regulatory framework, as a backdrop against which it is legislating, does not translate into a congressional command that that regulatory backdrop shall remain controlling as to the subject of its legislation despite intervening regulatory changes. That would be a tiny legislative tail wagging a giant legislative dog. If Congress had intended the Act to include a requirement that FERC set rates at cost, it would have said something like it said in another special statute--that the rates be "just and reasonable." See Farmers Union Cent. Exch., Inc. v. FERC, 734 F.2d 1486, 1504 (D.C. Cir. 1984).
 
 
 16
 Petitioners point to actual language in the statute that they argue at least implies that Congress intended FERC to set rates at cost. The Act imposes on the Commission the responsibility to "determine and fix the applicable portion of power capacity and power output to be made available hereunder and the terms applicable thereto." According to petitioners, that language makes no sense if it was contemplated that FERC could simply authorize Grant to sell at market prices. Petitioners again have a point; the language does seem to assume a regulated rate. On the other hand, if Congress meant this provision to constitute an independent mandate on the Commission to set cost-based rates for the project, it would hardly have provided that such authority was triggered only by the parties' disagreement.
 
 
 17
 Similarly unpersuasive is petitioners' suggestion that the nondiscrimination clause--"no discrimination between States"--is inconsistent with a market-based rate. One might think a nondiscrimination clause contemplates a below market rate. But again that notion goes to Congress' background assumption--not its command. In other words, the nondiscrimination clause serves a prophylactic purpose if below-market rates are required. But, we cannot say the clause mandates below market rates.
 
 
 18
 It is even argued that FERC's position violates the nondiscrimination clause: Grant sells power to its own customers at cost (as required by state regulation) and therefore Washington consumers and consequently the State of Washington is preferred against its neighboring States. This reading of the nondiscrimination clause seems strained, however, since it reduces FERC's authority to "determine and fix ... the terms applicable" for sales to power marketing agencies to a requirement that FERC set terms equal to those Washington State requires for sales by its public utilities to local customers. We cannot say that this statute evinces a clear congressional intent to impose a Most Favored Nation clause on the licensee--indeed, Congress considered and rejected an amendment that would have required sales to be "upon the same terms and conditions as power is offered for sale by the licensee in the State of Washington." May 20th Hearings at 12.
 
 
 19
 In sum, we think the statute is ambiguous; there is no clear congressional intent, and therefore the Chevron doctrine applies and we ask whether the Commission's interpretation is a permissible one. The question is not easy; if we were interpreting the statute de novo we might well conclude that petitioners have the better argument. But we are not, and we cannot say that FERC's interpretation is unreasonable. FERC logically concluded both that no discrimination would occur if power marketing agencies in each State were provided an equal opportunity to bid for the available power, and that it had fulfilled its statutory role of determining the portion of power to be made available to petitioners by requiring the future licensee to offer a "reasonable portion" of the power to them as a group.[6]
 
 
 20
 * * * *
 
 
 21
 Accordingly, we deny the petition.
 
 
 
 Notes:
 
 
 [1]
 The Commission expanded the ALJ's requirement to cover both firm and non-firm power, an issue not before us.
 
 
 [2]
 Petitioners also make a rather frail argument that the Commission failed to provide them sufficient notice that it might settle on allocation via a market mechanism. But in Williston Basin Interstate Pipeline Co. v. FERC, 165 F.3d 54, 63-64 (D.C. Cir. 1999), we held that a pipeline company had sufficient notice that FERC might adopt GDP growth as a benchmark for price increases where FERC had given notice that it would set a benchmark at the hearing, even though FERC had never stated that it was considering using GDP growth as the benchmark. Since in this case all parties challenged the ALJ's allocation on exceptions to the Commission, the possibility was left open that some other method of allocation would be adopted, and petitioners do not argue that the market is, in general, an unreasonable means of allocating a scarce resource.
 
 
 [3]
 See Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities, Order No. 888, FERC Stats. and Regs. 31,036 (1996).
 
 
 [4]
 The Idaho cooperatives alternatively argue that FERC cannot require the licensee to use market rates because the Federal Power Act excludes state utilities like Grant from FERC's rate-making authority. Since this argument was not presented to FERC, it is not properly before us.
 
 
 [5]
 See May 20th Hearings at 13-14 ("First, the licensee is a nonprofit agency and therefore must sell power at cost: Second, power sold must be at a rate competitive with Bonneville [which sells power at cost] ...: Third, the cost of money to the licensee-the interest rate--will reflect the licensee's status as a local government agency." )
 
 
 [6]
 FERC's interpretation finds support in the legislative history. See May 20th Hearings at 12 ("[T]he Federal Power Commission may decide the issue, if there is a dispute between the licensee and power marketing agencies ... over what constitutes a reasonable portion.").