**DUKE ENERGY TRADING AND MARKETING, L.L.C., Plaintiff—Appellant,**

**v.**

**Gray DAVIS, Governor of the State of California, Defendant—Appellee,**

**and**

**California Power Exchange Corporation, Defendant.**

**No. 01–55770.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 16, 2001.

Filed Sept. 20, 2001.

Geoffrey Bestor (argued), Barry R. Ostrager, Seth A. Ribner, Steven H. Bergman, Simpson Thacher & Bartlett, Universal City, California; Joel B. Kleinman, Larry F. Eisenstat, Geoffrey Bestor, Mark L. Perlis, Dickstein Shapiro Morin & Oshinsky LLP, for Appellant.

Danette E. Valdez (argued), Deputy Attorney General, Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistance Attorney General, Morris Beatus, Senior Assistant Attorney General, Andrea Lynn Hoch, Supervising Deputy Attorney General, San Francisco, California, for Appellee.

Before: HARLINGTON WOOD, Jr.,* KOZINSKI, and O'SCANNLAIN, Circuit Judges.

* Honorable Harlington Wood, Jr., Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit, sitting by designation.

## OPINION

O'SCANNLAIN, Circuit Judge.

We must decide whether a wholesale energy supplier is entitled to injunctive relief from orders issued by the Governor of California commandeering its contractual rights to deliver electricity to public utilities within the state.

### I

### A

The electricity contracts at issue in this appeal are the products of the restructuring of the California electricity market, which commenced with the 1996 passage of Assembly Bill 1890 ("AB 1890"). 1996 Cal. Legis. Serv. 854 (West). AB 1890 called for the creation of the California Power Exchange ("CalPX"), a nonprofit entity that would provide an initially-mandatory auction market for the trading of electricity.[1] Electricity Restructuring Act § 1(c). The CalPX was deemed a public utility under the Federal Power Act ("FPA"); hence, it was subject to the jurisdiction of the Federal Energy Regulatory Commission ("FERC") and operated pursuant to FERC-approved tariffs and FERC-approved wholesale rate schedules.[2] *Pac. Gas & Elec. Co.*, 77 FERC ¶ 61,204, at 61,803–05 (Nov. 26, 1996).

The CalPX commenced operations in March 1998. Initially, it operated only a single-price auction for day-ahead and day-of electricity trading (the "CalPX Core market") In the summer of 2000, it opened its CalPX Trading Services ("CTS") divi-

sion to operate a block forward market by matching supply and demand bids for longer-term electricity contracts ("block forward market" contracts or "BFM" contracts). AB 1890 required the three main investor-owned utilities ("IOUs") in California—Southern California Edison ("SCE"), Pacific Gas & Electric ("PG & E"), and San Diego Gas & Electric ("SDG & E")—to conduct virtually all of their electricity trading in the CalPX markets for a transition period. *See In re Cal. Power Exch.*, 245 F.3d at 1114–15.

Beginning in the summer of 2000, wholesale prices for electricity in the California market increased dramatically. *See id.* at 1115–16. Prices in the CalPX markets spiked particularly sharply. *San Diego Gas & Elec. Co.*, 93 FERC ¶ 61,121, at 61,353 (Nov. 1, 2000). PG & E and SCE, which were still subject to a retail rate freeze provided by AB 1890, incurred billions of dollars of debt because they were unable to pass their wholesale power costs on to their customers. *See id.* In January 2001, SCE and PG & E defaulted on hundreds of millions of dollars of obligations to the CalPX for December and January purchases in the CalPX Core and CTS block forward markets, including an outstanding debt of approximately $37 million for energy purchased through CTS from Duke. On January 18, 2001, following the downgrading of PG & E and SCE's debt ratings to "junk" status, the CalPX suspended trading privileges for the two IOUs.

The default of PG & E and SCE had a severe impact on the CalPX, as they were

---

1. Additional background information on the CalPX can be found in our opinion in *In re Cal. Power Exch.*, 245 F.3d 1110 (9th Cir. 2001).

2. Under the FPA, FERC has jurisdiction over "the sale of electric energy at wholesale in interstate commerce," i.e., sales of electricity

for resale. 16 U.S.C. § 824(b), (d). A "public utility" is defined under the FPA as "any person who owns or operates facilities subject to the jurisdiction of the Commission under this part." *Id.* § 824(e). The California Public Utilities Commission has jurisdiction over all retail sales of electricity in California.

two of the largest CalPX participants. At the end of January 2001, the CalPX suspended trading in both its Core and CTS block forward markets and commenced wrapping up its operations. It filed for protection under Chapter 11 of the Bankruptcy Code on March 9, 2001. PG & E filed for bankruptcy on April 6, 2001.

### B

The CTS block forward contracts at issue in this appeal are contracts between wholesale suppliers such as Duke, on the one hand, and SCE and PG & E, on the other, for the delivery of electricity through December 31, 2001. The CalPX CTS served as an intermediary between buyers and sellers, matching supply and purchase bids submitted by CTS participants. The CalPX also served as a clearinghouse for payments and scheduled physical delivery of the electricity purchased through its CTS division. Duke was the largest single supplier of electricity in the CTS block forward market, accounting for nearly 43% of all CTS trades.

The contracts created through CTS's matches incorporate the provisions of the FERC-approved CalPX CTS Second Revised Rate Schedule FERC No. 1 ("CTS Rate Schedule"). Section 5 of the CTS Rate Schedule provides certain creditworthiness requirements for all CTS participants. These include an acceptable credit rating, collateral requirements, and other minimum financial conditions.

In the event of a default, the CTS Rate Schedule provides that "[a] default in the CTS Market will be deemed to be a default in the Core Market and vice versa." Section 6.7.6 of the CTS Rate Schedule sets forth the default mitigation provisions to which participants are bound. It provides:

> If the CTS participant fails to pay any sum or to perform any other obligation to CTS or to CalPX when due, then CTS may, in its sole discretion and without further notice to the defaulting CTS Participant or regard to formalities of any kind ... do any or all of the following in any order: ... (e) sell or liquidate, as agent or attorney-in-fact for the defaulting CTS Participant, any Matches or cancel any bilateral deliveries it may then hold in the CTS Market ....

On January 5, 2001, the CalPX filed proposed Amendment 22 to its FERC tariff to permit PG & E and SCE to continue trading in the CalPX markets despite their deteriorating financial conditions. The proposed amendment would have relaxed the creditworthiness requirements included in the CTS Rate Schedule for certain CalPX market participants. It also would have authorized the CalPX governing board to waive collateral requirements. FERC ultimately rejected the proposed amendment, ruling that it represented an "inappropriate unilateral shifting of unacceptable financial risks" to wholesale energy suppliers, who had "negotiated over, and agreed to do business with the ... PX subject to, tariff provisions that included standard financial protections." *Cal. Indep. Sys. Operator Corp. et al.*, 94 FERC ¶ 61, 132, 2001 WL 275661, at *8 (Feb. 14, 2001), *reh'g denied*, 95 FERC ¶ 61,026, 2001 WL 350274 (Apr. 6, 2001).

In mid-January, after SCE and PG & E defaulted on their obligations in the CalPX Core and CTS Markets, the CalPX invoked its authority under the CTS Rate Schedule's default mitigation provisions and commenced efforts to sell SCE and PG & E's contractual right to delivery of electricity through 2001 pursuant to their CTS block forward contract positions. Given that the prevailing price for electricity on the spot market vastly exceeded the price for electricity provided by SCE and PG & E's CTS block forward contracts—which had been negotiated the previous

year—the value of SCE and PG & E's block forward positions, as of February 5, 2001, exceeded $200 million. The proceeds derived from the CalPX's sale of SCE and PG & E's contractual rights to electricity well below prevailing market rates were to be used to pay the IOUs' outstanding obligations to wholesale suppliers such as Duke.

### C

On January 17, 2001, in response to electricity blackouts and the threatened insolvency of the State's IOUs, Governor Davis declared a state of emergency, finding that "the imminent threat of widespread and prolonged disruption of electrical power ... constitutes a condition of extreme peril to the safety of persons and property within the state."

On January 19, after learning that the CalPX was about to liquidate its block forward contracts, SCE sought a temporary restraining order against the CalPX in California Superior Court. The court denied the TRO request, but held a hearing on January 24 to consider SCE's application for a preliminary injunction. *Id.* The State intervened in the proceeding and requested that a preliminary injunction be entered to provide Governor Davis time to decide whether to take action by invoking his emergency powers. *Id.* The court granted the State's request and entered a preliminary injunction against the CalPX to expire on February 2, 2001. On January 25, 2001, the State obtained a TRO, to expire on February 5, 2001, barring the CalPX's liquidation of PG & E's forward contracts, as well.

On February 2, as the preliminary injunction surrounding the SCE block forward contracts was about to expire, Governor Davis issued an Executive Order purporting to "commandeer" SCE's block forward contracts "to be held subject to the control and coordination of the State of California." The Executive Order was promulgated pursuant to section 8572 of the California Emergency Services Act, which provides that "[i]n the exercise of the emergency powers hereby vested in him during a ... state of emergency, the Governor is authorized to commandeer or utilize any private property or personnel deemed by him necessary in carrying out the responsibilities hereby vested in him as Chief Executive of the state and the state shall pay the reasonable value thereof." Cal. Gov't Code § 8572. On February 5, Governor Davis issued a similar Executive Order commandeering PG & E's block forward contracts. In press releases publicizing the Executive Orders, Governor Davis explained that "I am using my emergency powers to seize options to buy very inexpensive power that would otherwise be lost forever.... By acting quickly and decisively, we have rescued these contracts from the auction block and preserved their low-cost value for consumers."

Duke filed the instant suit against Governor Davis and the CalPX on February 8, 2001. Duke sought injunctive relief against Governor Davis pursuant to *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), alleging that Governor Davis's commandeering orders were preempted by federal law and hence violated the Supremacy Clause; Duke also alleged that the orders violated the Contracts Clause. In addition, Duke brought a breach of contract claim against the CalPX.

Governor Davis moved to dismiss on sovereign immunity grounds, and, in the alternative, moved for summary judgment on the merits. Duke filed a cross-motion for summary judgment. Prior to the hearing on the motions, Duke and the State came to an interim agreement whereby

Duke agreed to provide electricity under the terms of the contracts directly to the California Department of Water Resources, and the State agreed to pay Duke the contract price for the electricity delivered. The CalPX, embroiled as it was in bankruptcy proceedings, failed to answer Duke's complaint or move for summary judgment.

On April 30, 2001, following a hearing on the summary judgment motions, the district court dismissed Duke's claims against Governor Davis on sovereign immunity grounds without further explanation. Duke thereupon dismissed the CalPX from the action pursuant to Fed.R.Civ.P. 41(a)(1)(i) and filed this timely appeal.

Meanwhile, on March 15, 2001, the CalPX filed a claim with the California Victims Compensation and Government Claims Board for the liquidation value of the block forward market contracts commandeered by Governor Davis. This action is still pending.[3]

## II

■ At the time that the district court dismissed this action against Governor Davis on sovereign immunity grounds, the CalPX still remained a defendant. Duke thereupon dismissed its claims against the CalPX without prejudice pursuant to Fed. R.Civ.P. 41(a)(1)(i),[4] which grants plaintiffs the absolute right to dismiss an action

without prejudice provided that the defendant has not yet filed an answer or a motion for summary judgment. On the same day that Duke dismissed the CalPX, Duke filed its notice of appeal challenging the district court's dismissal of Governor Davis on sovereign immunity grounds.

Governor Davis contends that we lack appellate jurisdiction over Duke's appeal under 28 U.S.C. § 1291. He argues that the district court's dismissal of Duke's claims against him was not a final judgment in light of the fact that Duke's claims against the CalPX still remained. Governor Davis further submits that Duke's subsequent dismissal of the CalPX without prejudice pursuant to Rule 41(a)(1)(i) constitutes an impermissible attempt by Duke to "manufacture" a final judgment in order to invoke our appellate jurisdiction.

■ Parties may appeal "final decisions of the district courts." 28 U.S.C. § 1291. A "final decision" for purposes of § 1291 is a "decision by the District Court that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978).

■ Whether the district court's dismissal of Governor Davis constituted a final judgment for purposes of appellate jurisdiction under § 1291 depends upon the effect of Duke's dismissal of the CalPX

---

**3.** Governor Davis's motions for judicial notice of the following documents are GRANTED: Statement of Claim filed March 15, 2001 with the California Victim Compensation and Government Claims Board by the CalPX; Letter dated May 31, 2001 to the State of California Board of Control from Susan D. Rossi, Managing Attorney of CalPX; Notice of Motion and Motion for Order Approving Debtor's Entry Into Stipulation Authorizing Official Committee of Participant Creditors to Prosecute and Defend Litigation in the Name of Debtor dated May 10, 2001, filed by CalPX in U.S.

Bankruptcy Court for the Central District of California No. LA 01–16577–ES; Order of Bankruptcy Judge Erithe A. Smith filed June 28, 2001 granting such motion.

**4.** Fed.R.Civ.P. 41(a)(1)(i) provides that "an action may be dismissed by the plaintiff without order of the court ... by filing a notice of dismissal at any time before service by the adverse party of an answer or of a motion for summary judgment, whichever first occurs ...."

pursuant to Rule 41(a)(1)(i). We have held that Rule 41(a)(1)(i) grants plaintiffs "an absolute right to dismiss [ ] without prejudice" claims against one or more defendant, and requires no action on the part of the court. *Pedrina v. Chun,* 987 F.2d 608, 610 (9th Cir.1993). In *Pedrina,* we emphasized the absolute nature of the plaintiff's right to dismiss under Rule 41(a)(1)(i):

> The [filing of a Rule 41(a)(1)(i) notice] itself closes the file. There is nothing the defendant can do to fan the ashes of that action into life and the court has no role to play. This is a matter of right running to the plaintiff and may not be extinguished or circumscribed by adversary or court. There is not even a perfunctory order of court closing the file. Its alpha and omega was the doing of the plaintiff alone.

*Id.* (quoting *American Cyanamid Co. v. McGhee,* 317 F.2d 295, 297 (5th Cir.1963)). The effect of the filing of a notice of dismissal pursuant to Rule 41(a)(1)(i) "is to leave the parties as though no action had been brought." *Commercial Space Mgmt. Co. v. Boeing Co.,* 193 F.3d 1074, 1077 (9th Cir.1999). Once the notice of dismissal has been filed, the district court loses jurisdiction over the dismissed claims and may not address the merits of such claims or issue further orders pertaining to them. *See id.* at 1077 n. 4, 1079.

Duke's exercise of its absolute right to dismiss the CalPX pursuant to Rule 41(a)(1)(i) following the district court's dismissal of Governor Davis on sovereign immunity grounds left "nothing for the court to do but execute the judgment." Thus, the district court's judgment constituted a "final decision" for purposes of 28 U.S.C. § 1291. *See Coopers & Lybrand,* 437 U.S. at 467, 98 S.Ct. 2454. To hold otherwise would be tantamount to construing § 1291 as implicitly limiting a plaintiff's absolute right to dismiss a defendant without prejudice—i.e., to "unjoin" a defendant—pursuant to Rule 41(a)(1)(i). None of the cases cited by Governor Davis supports such a proposition.

Governor Davis relies upon *Dannenberg v. The Software Toolworks Inc.,* 16 F.3d 1073 (9th Cir.1994), as support for his argument that we lack appellate jurisdiction over this appeal. Governor Davis's reliance on *Dannenberg* is misplaced. In *Dannenberg,* we held that we did not have jurisdiction under § 1291 over an order granting partial summary judgment where the parties stipulated to the dismissal of the surviving claims without prejudice, subject to the plaintiff's right to reinstate them in the event of reversal on appeal. *Id.* at 1076–77. Observing that "[i]n essence, the claims [that had been dismissed without prejudice] remained in the district court pending a decision by this court," we concluded that "litigants should not be able to avoid the final judgment rule without fully relinquishing the ability to further litigate unresolved claims." *Id.* at 1077.

*Dannenberg* did not involve the effect of the complete dismissal of a defendant pursuant to Rule 41(a)(1)(i) for appellate jurisdiction purposes, and hence is distinguishable from the scenario presented here. The claims that survived partial summary judgment in *Dannenberg* "in essence ... remained in the district court" pending a decision in our court; here, in contrast, the district court was immediately divested of jurisdiction over Duke's claims against the CalPX immediately upon Duke's filing of its Rule 41(a)(1)(i) notice of dismissal. *Commercial Space Mgmt. Co.,* 193 F.3d at 1077 n. 4, 1079. Hence, there are no "unresolved" claims that "in essence ... remain in the district court." *Dannenberg,* 16 F.3d at 1077.

In *State of Missouri ex rel. Nixon v. Coeur D'Alene Tribe,* 164 F.3d 1102 (8th

Cir.1999), the Eighth Circuit held that a Rule 41(a)(1)(i) dismissal of a remaining defendant does not render a previous order finally dismissing another defendant "non-final" for purposes of appellate jurisdiction under 28 U.S.C. § 1291. The court explained:

> The Tribe relies primarily upon cases from other circuits holding that a voluntary dismissal of the claims pending against a defendant must be with prejudice to render final and appealable a previous order dismissing other claims *against the same defendant* .... These cases further the well-entrenched policy that bars a plaintiff from splitting its claims against a defendant. But this policy does not extend to requiring a plaintiff to join multiple defendants in a single lawsuit, so the policy is not violated when a plaintiff "unjoins" multiple defendants through a voluntary dismissal without prejudice.

164 F.3d at 1106. *See also* 8 Moore's Federal Practice ¶ 41.33[8][g][1] (3d ed. 1998) ("The plaintiff should [also] be permitted to expedite review of an involuntary dismissal of a defendant by dismissing the remaining defendants. Although an attempt to facilitate an appeal of an adverse order by voluntarily dismissing the remaining claims is generally prohibited unless the dismissal is with prejudice ... the complete dismissal of a defendant from the lawsuit to expedite review should be permitted since the defendant will not be subject to the risk of multiple suits in different forums."). We agree with the Eighth Circuit and hold that we have jurisdiction over Duke's appeal.

### III

■ Under the default mitigation provisions of the CalPX's CTS rate schedule, the right to liquidate the IOUs' block forward contract positions does not belong to wholesale electricity suppliers such as Duke, but rather to the CTS itself, "in its sole discretion." Based on this fact, Governor Davis contends that there is no "case or controversy" between himself and Duke, as required by Article III of the United States Constitution. Governor Davis's challenge to the Article III case or controversy requirement appears to be two-fold.

First, Governor Davis appears to suggest that Duke does not have standing to enjoin the commandeering orders because it has not suffered an injury-in-fact, an irreducible requirement for Article III standing, given that Duke did not have the legal right to liquidate the IOUs' forward contract positions in the first instance. While it is true that the *legal* right to liquidate the IOUs' forward positions belongs to the CalPX CTS division, the CTS would have no more than a de minimis *beneficial* interest in the proceeds derived from the liquidation. The value of the IOUs' forward contract positions constituted security for their past purchases through the CalPX markets from wholesale suppliers of electricity such as Duke. It is thus beyond dispute that Duke, owed millions of dollars by the defaulting IOUs for past electricity purchases in both the CalPX core and CTS markets, would be one of the beneficiaries of the CTS's liquidation of the IOUs' forward contract positions. As a beneficial interest-holder in the liquidation value of the IOUs' forward contracts, Duke suffered an injury-in-fact from Governor Davis's commandeering orders and has standing to bring this action.[5]

---

**5.** Governor Davis asserts that Duke "should not be given the opportunity to gain an advantage over the other suppliers who also may share an interest in the liquidation value of the BFM contract being pursued by the CalPX" in its takings claim before the Califor-

*See, e.g., Clinton v. City of New York,* 524 U.S. 417, 434, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) (holding that beneficiaries have standing to sue, citing "self-evident proposition that more than one party may have standing to challenge a particular action or inaction"); *Tyler v. Cuomo,* 236 F.3d 1124, 1135 (9th Cir.2000) (third-party beneficiaries have Article III standing to sue).

■ Second, Governor Davis also appears to suggest that Duke does not have standing to pursue this action given that, under the CTS rate schedule, the decision whether to liquidate the IOUs' forward contract positions is left to the CTS itself "in its sole discretion." The fact that liquidation of the forward contracts is discretionary on the part of a third-party to this appeal raises a potential redressability issue. The standing requirement of Article III is not met where it is "purely speculative" whether the plaintiff's injury "fairly can be traced to the challenged action of the defendant," or instead "result[ed] from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

Although liquidation of the IOUs' forward contract positions is discretionary on the part of the CalPX, there is nothing at all "speculative" about tracing Duke's injury to Governor Davis's commandeering orders rather than to some independent decision against liquidation made by the CalPX. Indeed, the CalPX was in the process of liquidating the IOUs' forward contract positions when the State successfully intervened in the California Superior Court actions in support of the IOUs' request for injunctive relief against the CalPX. Governor Davis issued his commandeering orders just as the Superior Court injunctions against the liquidation by CalPX were about to expire. The chronology of events leading up to the issuance of Governor Davis's commandeering orders forecloses any doubt that Duke's injury stems from the commandeering orders alone.

Thus, the Article III "case or controversy" requirement is met here.

## IV

We next address whether Duke's action against Governor Davis is barred by state sovereign immunity, as the district court concluded.

### A

■ Under *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) and its progeny, a suit challenging the legality under federal law of a state official's action in enforcing state law is not a suit against the State, and hence is not subject to state sovereign immunity. *Id.* at 159–160, 28 S.Ct. 441. Since the State cannot authorize its officers to violate federal law, such officers are "stripped of [their] official or representative character and are subjected in [their] person to the consequences of [their] individual conduct." *Id. Ex parte Young* relief is limited to actions seeking *prospective* relief against state officials in their official capacity; actions for retroac-

nia Victims Compensation and Government Claims Board on behalf of all electricity wholesale sellers injured by Governor Davis's commandeering orders. The pendency of the CalPX's takings claim in the state proceeding, however, has no bearing on the question of whether Duke has met the case or controversy requirement of Article III. Nor is it clear

how Duke might obtain an unfair advantage over other suppliers by pursuing this action: Should Duke succeed, the commandeering orders would be enjoined, allowing for the liquidation of the forward contracts. It would then be up to the CalPX to decide how best to distribute proceeds from the liquidation sale.

tive relief against state officers sued in their official capacity are regarded as actions against the State itself for Eleventh Amendment purposes. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

Governor Davis contends that Duke is requesting impermissible retroactive relief in this action. According to Governor Davis, "Duke's claims seek relief for losses arising out of transactions with the defaulting utilities which occurred *prior* to Governor Davis's commandeering of the BFM contracts." Governor Davis further argues that his issuance of the commandeering orders is in essence a *fait accompli,* which could at most be construed as a *past* violation of federal law.

■ First, the fact that Duke's goal in seeking to enjoin Governor Davis's commandeering orders is to improve its chances of recovering the past-due obligations from the *IOUs* has no state sovereign immunity significance. State sovereign immunity bars actions for damages against the *State* for past violations of federal law. *Natural Res. Def. Council v. Cal. Dept. of Transp.,* 96 F.3d 420, 422 (9th Cir.1996) (federal court may not award retroactive relief that requires payment of funds from state treasury). Duke's attempt to collect the IOUs' defaulted obligations in no way represents an effort to invade the State's fisc nor to obtain any other retroactive remedy against the State.

Second, Governor Davis's characterization of the issuance of his commandeering orders as a *fait accompli* is similarly insufficient to immunize him from *Ex parte Young* liability. Because the contracts that Governor Davis commandeered require delivery of electricity through December 31, 2001, Governor Davis's commandeering orders have an on-going effect that can be enjoined without rendering the relief "retrospective" in nature, consistent

with *Ex parte Young.* Should Duke prevail on the merits, the CalPX would be free to liquidate the IOUs' remaining positions in the block forward market contracts.

### B

■ Governor Davis further contends that Duke's action falls within an exception to *Ex parte Young* carved out by *Idaho v. Coeur d'Alene Tribe,* 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997). In *Coeur D'Alene,* the Supreme Court held that the Coeur d'Alene Tribe could not invoke the *Ex parte Young* exception to state sovereign immunity in an action seeking to divest the State of all regulatory authority over certain submerged lands located within Idaho. A majority of the Court explained that "this case is unusual in that the Tribe's suit is the functional equivalent of a quiet title action [against a State] which implicates special sovereignty interests." *Id.* at 281, 117 S.Ct. 2028. In rejecting the Tribe's *Young* action, the Court emphasized the "far-reaching and invasive relief" sought by the Tribe:

> The suit seeks, in effect, a determination that the lands in question are not even within the regulatory jurisdiction of the State. The requested injunctive relief would bar the State's principal officers from exercising their governmental powers and authority over the disputed lands and waters. The suit would diminish, even extinguish, the State's control over a vast reach of lands and waters long deemed by the State to be an integral part of its territory. To pass this off as a judgment causing little or no offense to Idaho's sovereign authority and its standing in the Union would be to ignore the realities of the relief the Tribe demands.

*Id.* at 282, 117 S.Ct. 2028.

Governor Davis contends that Duke's action similarly implicates the State's "spe-

cial sovereignty interests," asserting that "there is very little that could be more sovereign than taking private property for the public benefit and safety during times of emergency."[6] However, Governor Davis neglects the factual uniqueness of *Coeur d'Alene* that the Court found justified a narrow limitation on the *Ex parte Young* doctrine. In *Coeur d'Alene,* the Tribe sought declaratory and injunctive relief based on a claim of ownership of certain submerged lands, including a declaration of entitlement to exclusive use and occupancy, a declaration of the invalidity of all state regulation of the lands, and an injunction against any violation of the Tribe's rights in the land. 521 U.S. at 265, 117 S.Ct. 2028. Had the Tribe received the relief it requested, the State would have permanently lost control over acres of territory long deemed to be part of its sovereign borders.

■■■ A recent case from this Court, *Agua Caliente Band of Cahuilla Indians v. Hardin,* 223 F.3d 1041 (9th Cir.2000), explained the narrowness of the holding in *Coeur d'Alene:*

> In *Coeur d'Alene,* it was the unique divestiture of the state's broad range of controls over its own lands that made the *Young* exception to sovereign immunity inapplicable. Thus, in the case on appeal here, characterizing the state's

interest in taxation as a core sovereignty area does not address the question posed by *Coeur d'Alene.* Indeed, *the question posed by Coeur d'Alene is not whether a suit implicates a core area of sovereignty, but rather whether the relief requested would be so much of a divestiture of the state's sovereignty as to render the suit as one against the state itself.*

*Id.* at 1048 (emphasis added). One cannot disagree with Governor Davis' characterization of the exercise of his emergency powers to take private property for the public's benefit and safety as a core state sovereignty area—undoubtedly it is.[7] Rather, the proper question is whether granting Duke the relief it seeks would "be so much of a divestiture of the state's sovereignty as to render the suit as one against the state itself." *Id.*

If Duke were requesting relief that would permanently divest the Governor of his future ability to invoke his emergency powers or remove an entire area over which he could previously use his powers, such as California's intrastate electricity supply, then the narrow holding of *Coeur d'Alene* might well apply. Instead, Duke seeks an injunction against a specific executive order in an area preempted by federal law, which falls squarely under *Ex parte*

6. It is helpful to recount the facts of *Ex parte Young* here. In *Young,* shareholders of various railroads sought to enjoin the Minnesota Attorney General from enforcing state statutes duly enacted by the Minnesota Legislature that allegedly deprived them of due process and equal protection. 209 U.S. at 130, 28 S.Ct. 441. The statutes reduced the rates the railroad companies could charge for transporting passengers and cargo. *Id.* at 127, 28 S.Ct. 441. Significantly, in *Young,* the Court held that the shareholders *could* bring their suit in federal court for prospective injunctive relief against the state officer acting in his official capacity, despite the fact that there is "little that could be more sovereign" than a

state enacting a law for its citizens' general welfare and its subsequent enforcement by the state attorney general.

7. We do not question the importance of California's interest in having a reliable and affordable supply of· electricity; however, the importance of this interest does not bar the application of the *Young* doctrine. *See Coeur d'Alene,* 521 U.S. at 296, 117 S.Ct. 2028 ("[W]e have never doubted the importance of state interests in cases falling squarely within our past interpretations of the *Young* doctrine.") (O'Connor, J., concurring in part and in the judgement).

*Young.* Granting Duke the relief it requests will not deprive Governor Davis of his regulatory authority and police power to deal with the electricity crisis; such an attempt would be much closer to the facts in *Coeur d'Alene.*

In *Coeur d'Alene* itself, Justice O'Connor recognized the difference between enjoining a specific state activity and depriving a state of all regulatory authority:

> [T]he Tribe does not merely seek to possess land that would otherwise remain subject to state regulation, or to bring the State's regulatory scheme into compliance with federal law. Rather, the Tribe *seeks to eliminate altogether the State's regulatory power over the submerged lands at issue*—to establish not only that the State has no right to possess the property, but also that the *property is not within Idaho's sovereign jurisdiction at all.*

*Id.* at 289, 117 S.Ct. 2028 (emphasis added). While the "difference between the type of relief barred by the Eleventh Amendment and that permitted under *Ex parte Young* will not in many instances be that between day and night," *Edelman v. Jordan,* 415 U.S. 651, 667, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the case before us falls on the *Ex parte Young* side of the line, and we need not determine how much divestiture of a state's sovereignty is enough to trigger *Coeur d'Alene.*[8]

This Court has most recently expressly rejected Governor's Davis's broad reading of *Coeur d'Alene* in *Goldberg v. Ellett* (*In re Ellett*), 254 F.3d 1135 (9th Cir.2001). In *Goldberg,* we held that *Coeur d'Alene* did not bar an *Ex parte Young* action to enjoin the Director of the California Franchise Tax Board from attempting to collect a bankrupt's tax debts discharged in bankruptcy. While recognizing the "profound nature" of the State's sovereign interest in the administration of its tax system, we held that "the narrow exception to *Ex parte Young* carved out by *Coeur d'Alene* requires an assessment of the intrusion on state sovereignty of the *specific relief* requested by the plaintiff, not whether the relief merely *relates to* a more general area of core state sovereign interest." 254 F.3d at 1143 (emphasis added). We concluded that the bankrupt's action was not barred under *Coeur d'Alene* because he "simply seeks prohibitory relief preventing [the Director of the FTB] from violating the bankruptcy court's discharge injunction by attempting to collect from [him] specific pre-petition income tax obligations duly discharged in bankruptcy under federal law," which we contrasted with the sweeping and intrusive relief at issue in *Coeur d'Alene. Id.*

Thus, under *Agua Caliente* and *Goldberg,* the fact that Duke's lawsuit implicates the State's sovereignty interest in the gubernatorial exercise of emergency powers does not suffice to trigger the *Coeur d'Alene* exception to *Ex parte Young.*[9]

---

8. The extent to which *Coeur d'Alene* is limited to its "particular and special circumstances," 521 U.S. at 287, 117 S.Ct. 2028, cannot be overstated. The Court states that "navigable waters uniquely implicate sovereign interests," *id.* at 284, 117 S.Ct. 2028, submerged lands have a "unique status in the law and [are] infused with a public trust the State itself is bound to respect," *id.* at 283, 117 S.Ct. 2028, "these lands are tied in a unique way to sovereignty," *id.* at 286, 117 S.Ct. 2028, and even includes a citation to the

Magna Carta to show the relation between navigable waters and sovereign interests. *Id.* at 284, 117 S.Ct. 2028.

9. No one can doubt that Governor Davis could not commandeer the federally owned electricity generators on the Naval Base in San Diego to serve distressed customers nearby. Such a bold action, no matter how necessary to the health and welfare of California's citizens, would certainly be preempted by the Constitution, which gives Congress the "Pow-

Rather, Duke "merely seeks prohibitory relief" preventing Governor Davis from exercising his emergency powers in direct conflict with federal law in an area within the exclusive jurisdiction of FERC. *See Goldberg,* 254 F.3d at 1143. The relief Duke seeks cannot remotely be analogized to the sweeping relief requested by the Tribe in *Coeur d'Alene* in an area that uniquely implicated state sovereignty concerns. Accordingly, the *Coeur d'Alene* exception to *Ex parte Young* is inapplicable here.

### C

■■■ Finally, Governor Davis contends that Congress intended to preclude *Ex parte Young* actions against state officials under the Federal Power Act. *See Seminole Tribe v. Florida,* 517 U.S. 44, 74–75, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (holding that Congress intended to preclude *Ex parte Young* actions under the Indian Gaming Regulatory Act because

er to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. Art. IV, § 3. *See Kleppe v. New Mexico,* 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976) (enjoining New Mexico from removing wild horses and burros from federal land); *U.S. v. California,* 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947) (granting the United States an injunction against California to stop it from leasing federal offshore property to private corporations who were extracting petroleum, gas, and other mineral deposits). The invocation of his police power would not trump standard federal preemption principles and this Court's ability to enforce them. So, too, may this Court enforce preemption principles embodied in the Supremacy Clause despite a State's interest in its sovereignty. This Court would no more trammel on state sovereignty interests by enjoining the Governor's commandeering of these block forward contracts than by enjoining the Governor's commandeering of the Navy's power plants.

the Act provided much more limited relief against state officials than relief available under *Ex parte Young* ).

■■■ Duke correctly observes that the *Seminole Tribe* exception to *Ex parte Young,* which Governor Davis invokes, pertains only to *Ex parte Young* actions brought to enjoin state officials from ongoing violations of federal *statutory,* rather than *constitutional,* law. *Id.* at 74, 116 S.Ct. 1114; *Ellis v. Univ. of Kan. Med. Ctr.,* 163 F.3d 1186, 1197 (10th Cir.1998). Duke's preemption claim against Governor Davis is not predicated on the Federal Power Act, but rather on the Supremacy Clause of the United States Constitution. *Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 963, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986) (characterizing preemption of state regulatory actions inconsistent with FERC rulings as "a matter of enforcing the Supremacy Clause"). Thus, the *Seminole Tribe* exception to *Ex parte Young* is also inapplicable.[10]

**10.** Even if Duke's preemption claim could be characterized as predicated on the FPA, section 201(f) of the FPA does not remotely evidence a Congressional intent to preclude *Ex parte Young* actions against state officials. Section 201(f) provides:

> No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing acting as such in the course of his official duty, unless such provision makes specific reference thereto.

16 U.S.C. § 824(f). Section 201(f) simply means that state-owned agencies may not be regulated as "public utilities" subject to FERC's jurisdiction. *Transmission Access Policy Study Group v. F.E.R.C.,* 225 F.3d 667, 697 (D.C.Cir.2000). Thus, state and municipal agencies are not subject to the obligations

## V

The parties agree that the relevant facts are not in dispute and they each invite us to address the merits of Duke's action. Given that further delay would be highly prejudicial to Duke, as it seeks only prospective relief relating to contracts that expire by December 31, 2001, we accept the parties' invitation.

### A

The FPA applies to "the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b), (d). FERC's exclusive jurisdiction extends over all facilities for such transmission or sale of electric energy. *See id.* As a result, FERC has jurisdiction over any "public utility," which the FPA defines as any person who owns or operates facilities subject to FERC's jurisdiction. 16 U.S.C. § 824(e). *See generally Automated Power Exch., Inc. v. FERC,* 204 F.3d 1144 (D.C.Cir.2000). Retail sales of electricity and wholesale intrastate sales are within the exclusive jurisdiction of the States and are not implicated here. *In re Cal. Power Exch.,* 245 F.3d at 1114. The CalPX is a "public utility" subject to FERC's exclusive jurisdiction. *Automated Power Exch.,* 204 F.3d at 1147 & n. 2. As a result, the CalPX operated pursuant to FERC-approved rate schedules and tariffs. *In re Cal. Power Exch.,* 245 F.3d at 1114.

The Supreme Court has observed that, in the FPA, "Congress meant to draw a bright line easily ascertained, between state and federal jurisdiction .... This was done in the Power Act by making

[FERC] jurisdiction plenary and extending it to all wholesale sales in interstate commerce except those which Congress has made explicitly subject to regulation by the States." *Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 966, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986) (quoting *FPC v. Southern Cal. Edison Co.,* 376 U.S. 205, 215–16, 84 S.Ct. 644, 11 L.Ed.2d 638 (1964)). The Court has explored the line separating state and federal jurisdiction under the FPA in a number of cases involving the "filed rate doctrine," which in essence provides that "interstate power rates filed with FERC or fixed by FERC must be given binding effect" by state authorities regulating in areas subject to state jurisdiction, e.g., retail rates; hence, FERC-approved rates preempt conflicting regulations adopted by the States. *Id.* at 962, 106 S.Ct. 2349. The Court has, moreover, observed that "the filed rate doctrine is not limited to 'rates' *per se* " or FERC orders that "deal in terms of prices or volumes of purchases." *Id.* at 966, 106 S.Ct. 2349 (holding that, under filed rate doctrine, a FERC-approved allocation of power preempted the North Carolina Utilities Commission's subsequent reallocation of power incident to its retail rate-setting authority).

### B

Governor Davis's commandeering orders directly nullify the security and default mitigation provisions of the FERC-approved CTS rate schedule, and hence cross the "bright line" between state and federal jurisdiction established by the FPA. By preventing the CalPX from liquidating the IOUs' block forward positions to cover

---

of the FPA, *see Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 554 n. 16, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), and FERC lacks authority to set their rates, *Kootenai Elec. Co-op., Inc. v. F.E.R.C.,* 192

F.3d 144, 148 (D.C.Cir.1999). Manifestly, section 201(f) does *not* immunize state officials from federal suit where they purport to regulate in areas subject to FERC's exclusive jurisdiction.

their defaults in the CalPX markets, Governor Davis's commandeering orders effectively rewrote the terms of the CTS rate schedule, depriving wholesale suppliers such as Duke of their bargained-for collateral and default mitigation rights. Of course, because the block forward contracts were within FERC's authority, Governor Davis could not simply have decreed that the IOUs' debts to their wholesale suppliers be forgiven. And yet his commandeering orders, which in both purpose and effect frustrated the wholesale suppliers' ability to receive at least partial payment for the IOUs' past purchases of electricity, were the functional equivalent of such an obviously impermissible decree.

FERC's rejection of the CalPX's proposed Amendment 22 to its FERC tariff is instructive. Amendment 22, which CalPX filed with FERC on January 5, 2001, would have lowered the short-term credit ratings required for CalPX market participants to obtain unsecured credit; the Amendment's purpose was to permit PG & E and SCE to continue trading in the CalPX markets. Most significantly, the proposed Amendment also would have granted new authority to the CalPX's governing board to waive the CalPX tariff's collateral requirements. FERC rejected the proposed Amendment, stating:

> The ISO [Independent System Operator] and PX tariffs, in their original forms, were designed to incorporate creditworthiness protections that were consistent with applicable provisions of commercial law.... [T]hird-party suppliers negotiated over, and agreed to do business with the ISO and PX subject to, tariff provisions that included standard financial protections. We find that by simply lowering the standards for the two largest buyers in these markets, the proposed amendments entail an inappropriate unilateral shifting of unacceptable financial risks to both large and small

third-party suppliers. Moreover, we are concerned that a lowering of the financial creditworthiness standard, without some assurance of payment for third party sales, would further increase prices paid by consumers. This is because ... the tariff revisions likely would increase the risk premium added to the price of power due to the exposure of non-payment.

94 FERC ¶ 61,132, 2001 WL 275661, at *8. The Governor's commandeering orders deprived wholesale suppliers of the very "standard financial protections" that the CalPX itself *unsuccessfully* petitioned FERC to eliminate from its tariff.

This case is distinguishable from the cases exploring the filed rate doctrine in one respect, however: By commandeering the wholesale suppliers' collateral, Governor Davis was acting *solely* in an area reserved for exclusive federal jurisdiction. Unlike the typical filed rate doctrine case, Governor Davis's orders were not even issued incident to an area of state regulatory authority. Thus, there can be little doubt that Governor Davis's orders constituted an impermissible intrusion into FERC's territory. As Justice Scalia has observed, "[i]t is common ground that if FERC has jurisdiction over a subject, the States cannot have jurisdiction over the same subject." *Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354, 377, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988) (Scalia, J., concurring).

The situation presented here is thus precisely the *reverse* of the situation presented in *Northern States Power Co. v. FERC*, 176 F.3d 1090 (8th Cir.1999), a case on which Governor Davis places a great deal of unwarranted reliance. In *Northern States*, FERC promulgated a tariff order that required a public utility to curtail electrical transmission to interstate whole-

sale customers on a comparable basis with its intrastate/retail consumers when it experiences power constraints. *Id.* at 1093. The court ruled that FERC's tariff order represented an attempt to regulate retail practices reserved exclusively to the States and therefore exceeded FERC's jurisdiction. *Id.* at 1096. *Northern States* has no relevance to Duke's preemption claim. The default mitigation and security provisions of the CTS rate schedule, with which Governor Davis's commandeering orders directly conflict, fall well within FERC's exclusive jurisdiction over interstate wholesale electricity sales. Governor Davis has encroached upon FERC's exclusive authority, not vice versa.

Governor Davis contends that his commandeering orders are not preempted because they "did not change the allocation of power to be delivered in California pursuant to the BFM contracts or alter Duke's obligations to provide the energy beyond the duration it previously agreed to with SCE and PG & E." This argument simply side-steps the issue at stake here: the conflict between Governor Davis's orders and the CTS rate schedule's security and default mitigation provisions. Without explanation, Governor Davis contends that "the proper focus is not whether there is a conflict with the tariffs, but whether there was a conflict between the state and federal schemes." The filed rate doctrine belies this assertion. Even so, FERC's rejection of the CalPX's proposed Amendment 22 amply demonstrates the conflict "between the state and federal schemes." The federal scheme established by FERC for transactions through the CalPX required "standard financial protections" and "assurance of payment for third party sales." 94 FERC ¶ 61,132, 2001 WL 275661, at *8. The "state scheme" evidenced by Governor Davis's commandeering orders deprived wholesale suppliers of their FERC-required collateral for past transactions, and hence of their "assurance of payment."

Thus, it is not enough that California agrees to pay the same rate to Duke or requires Duke to continue to supply electricity for a duration no longer than the block forward contracts provide. Indeed, in that respect, California is a complete substitute for SCE and PG & E. However, by commandeering the block forward contracts, Duke (and, derivatively, the CalPX) lost its FERC-protected right to standard financial protection, i.e., to liquidate its collateral if the buyers default on their obligations. It is Governor Davis's interference with the block forward contracts' security provisions that is preempted by the federal scheme.[11] FERC preempts regulation of the contracts' economics of administration, which, by destroying Duke's ability to exercise its rights to assure payment for third-party sales, is exactly why Governor Davis's executive order cannot stand. Hence, Governor Davis's commandeering orders to the extent that they conflict with FERC require-

---

11. At oral argument there was a discussion of whether Governor Davis could commandeer an airline-owned passenger jet parked at San Francisco International Airport, given that airlines and aircraft are highly regulated by the Federal Aviation Administration ("FAA"). The analogy is not apt, however, because the State of California could commandeer the aircraft and yet still abide by FAA regulations, such as the amount of continuous hours pilots can spend flying. Thus, federal regulations would not preempt Governor Davis's exercise of his police power in seizing the aircraft; rather, any use by the State that conflicted with federal regulations would be preempted. Here, it is the very act of commandeering the block forward contracts that is preempted because in so doing, the Governor nullified express requirements of a FERC-regulated and approved scheme. If Governor Davis could commandeer the contracts without disrupting the structure created by FERC, then we would have a situation closer to the aircraft hypothetical.

ments are void under the Supremacy Clause of the United States Constitution.[12]

## VI

For the foregoing reasons, the judgment of the district court is REVERSED. We remand to the district court with instructions that judgment be entered in favor of Duke Energy and that an appropriately tailored injunction against Governor Davis's commandeering orders be entered forthwith.

**REVERSED AND REMANDED.**

KOZINSKI, Circuit Judge, dissenting.

Whether plaintiff may maintain this action against the Governor of California under *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), is surely a close and difficult question. Judge O'Scannlain has written a fine opinion and I am almost persuaded—but not quite. I read *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997), as creating an exception to *Ex parte Young* where the suit implicates the state's fundamental sovereign interests. 521 U.S. at 282–84, 287–88, 117 S.Ct. 2028. Here, Governor Davis exercised the state's power of eminent domain in response to what was concededly a major emergency affecting the health, safety, welfare and comfort of the people of California. This emergency affected not merely the price of electrical power, but its very availability. For the first time in its history, the state was confronted with rolling blackouts which themselves caused serious disruptions; there was good reason to believe that far worse was in store.

Under authority vested in him by the state legislature, the Governor acted decisively to restore order in the electricity market and thus to avert further disrup-

tions. Plaintiff here challenges one aspect of the Governor's response; it asks the court to second-guess the actions of the Governor, taken for the purpose of averting what he reasonably believed to be an impending power catastrophe. A more pointed interference with the state's essential sovereign interests by the federal courts is hard to imagine. If *Coeur d'Alene* does not cover this situation, then it must apply only where Indian tribes challenge the state's title to submerged lands and nowhere else. Unlike the majority, I cannot read *Coeur d'Alene* quite so narrowly. Whether one follows the balancing approach of Justice Kennedy's principal opinion, or the categorical approach of Justice O'Connor's concurrence, "it simply cannot be said that the suit [here] is not a suit against the State." 521 U.S. at 296, 117 S.Ct. 2028 (O'Connor, J., concurring in part and concurring in the judgment).

Because it is important not to let the case become moot by the passage of time, I will not belabor the point. I believe the lines are clearly drawn by Judge O'Scannlain's excellent opinion and my, hopefully, adequate dissent.

---

12. Because Duke is entitled to relief against Governor Davis on its claim under the Su-

premacy Clause, we need not reach its Contracts Clause claim.