375 F.3d 831
 People of the State of CALIFORNIA, ex rel; Bill LOCKYER, Attorney General, Attorney General of the State of California, Plaintiffs-Appellants,
v.
DYNEGY, INC.; Dynegy Power Marketing, Inc.; NRG Energy, Inc.; Xcel Energy, Inc.; West Coast Power LLC; Cabrillo Power I LLC; Cabrillo Power II LLC; El Segundo Power LLC; Long Beach Generation LLC, Defendants-Appellees.
People of the State of California, ex rel Bill Lockyer, Attorney General of the State of California; Bill Lockyer, Attorney General, Attorney General of the State of California, Plaintiffs-Appellants,
v.
Reliant Energy, Inc.; Reliant Energy Services, Inc.; Reliant Energy Power Generation, Inc.; Reliant Resources, Inc.; Reliant Energy Coolwater, LLC; Reliant Energy Ellwood, LLC; Reliant Energy Etiwanda, LLC; Reliant Energy Mandalay, LLC; Reliant Energy Ormond Beach, LLC, Defendants-Appellees.
People of the State of California, ex rel Bill Lockyer, Attorney General of the State of California; Bill Lockyer, Attorney General, Attorney General of the State of California, Plaintiffs-Appellants,
v.
Mirant Corporation; Mirant California, L.L.C.; Mirant Potrero L.L.C.; Mirant Americas Energy Marketing, L.P.; Mirant California Investments, Inc.; Mirant Americas Inc.; Southern Energy Golden States Holdings, Inc., Defendants-Appellees.
People of the State of California, ex rel. Bill Lockyer, Attorney General, Attorney General of the State of California, Plaintiff-Appellant,
v.
Reliant Energy, Inc.; Reliant Energy Services, Inc.; Reliant Energy Power Generation, Inc.; Reliant Resources, Inc.; Reliant Energy Coolwater, LLC; Reliant Energy Ellwood, LLC; Reliant Energy Etiwanda, LLC; Reliant Energy Mandalay, LLC; Reliant Energy Ormond Beach, LLC; Mirant
Corporation; Mirant California, L.L.C.; Mirant Delta, L.L.C.; Mirant Potrero LLC; Mirant Americas Energy Marketing, L.P.; Mirant California Investments, Inc.; Mirant Americas, Inc.; Southern Energy Golden States Holdings, Inc.; Dynegy, Inc.; Dynegy Power Marketing, Inc.; Nrg Energy, Inc.; Xcel Energy, Inc.; West Coast Power, L.L.C.; Cabrillo Power I, L.L.C.; Cabrillo Power II LLC; El Segundo Power, L.L.C.; Long Beach Generation LLC, Defendants-Appellees.
 No. 02-16619.
 No. 03-15588.
 No. 02-16625.
 No. 02-16629.
 United States Court of Appeals, Ninth Circuit.
 Argued August 12, 2003.
 Submitted as to all parties except NRG Energy, Inc. October 27, 2003.*
 Submitted as to NRG Energy, Inc. April 15, 2004.**
 Filed July 6, 2004.
 
 COPYRIGHT MATERIAL OMITTED Tamar Pachter, Deputy Attorney General, State of California, San Francisco, CA, argued the case for the appellant and was on the briefs. Attorney General Bill Lockyer, and Thomas Greene, Damon Connolly, Danette Valdez, Pamela Merchant, Paul Stein, and Laura Zuckerman, Office of the Attorney General, were also on the briefs.
 Terry J. Houlihan, Bingham McCutchen LLP, San Francisco, CA, argued the case for the appellees and was on the joint briefs of the appellees, as attorney for appellees Reliant Energy, Inc.; Reliant Energy Services, Inc.; Reliant Energy Power Generation, Inc.; Reliant Resources, Inc.; Reliant Energy Coolwater, Inc.; Reliant Energy Ellwood, Inc.; Reliant Energy Etiwanda, Inc.; Reliant Energy Mandalay, Inc.; and Reliant Energy Ormond Beach, Inc. Nora Cregan and Thomas S. Hixson were also on the joint briefs as attorneys for the same parties.
 John M. Grenfell, Douglas R. Tribble, and Michael J. Kass, Pillsbury Winthrop LLP, San Francisco, CA, were on the joint briefs of the appellees, as attorneys for appellees Dynegy, Inc.; Dynegy Power Marketing, Inc.; West Coast Power, LLC; Cabrillo Power I, LLC; Cabrillo Power II, LLC; El Segundo Power, LLC; and Long Beach Generation, LLC.
 John A. Sturgeon and Bryan A. Merryman, White & Case LLP, Los Angeles, CA, were on the joint briefs of the appellees, as attorneys for appellees Mirant Corporation; Mirant California, LLC; Mirant Delta, LLC; Mirant Potrero, LLC; Mirant Americas Energy Marketing, LP; Mirant California Investments, Inc.; Mirant Americas, Inc.; and Southern Energy Gold States Holdings, Inc.
 David T. Peterson and Theodore G. Spanos, Morgan, Lewis & Brockius LLP, Los Angeles, CA, were on the joint briefs of the appellees, as attorneys for appellee Xcel Energy, Inc.
 Carlton A. Varner and Timothy B. Taylor, Sheppard, Mullin, Richter & Hampton LLP, Los Angeles, CA, were on the joint briefs of the appellees, as attorneys for appellee NRG Energy, Inc.
 Attorney General Christine O. Gregoire, Seattle, WA, and Tina E. Kondo and W. Stuart Hirschfeld, Office of the Attorney General; and Attorney General Hardy Myers, Salem, OR, and Robert T. Roth and Colin A. Yost, Office of the Attorney General; were on the brief of amici curiae State of Washington and State of Oregon in support of plaintiff.
 Appeal from the United States District Court for the Northern District of California; Vaughn R. Walker, District Judge, Presiding. D.C. Nos. CV-02-01854-VRW, CV-02-01791-VRW, CV-02-01914-VRW.
 Before: CYNTHIA HOLCOMB HALL, DIARMUID F. O'SCANNLAIN, and EDWARD LEAVY, Circuit Judges.
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 We must decide whether federal removal jurisdiction lies over California state court actions alleging that several power companies fraudulently failed to deliver reserve energy that might otherwise have helped to avert the state's energy crises of 2000 and 2001.
 
 
 2
 * Far-reaching economic and regulatory changes in one of the largest electric energy markets in the world provide the backdrop to this litigation. We begin with some context necessary to understanding the legal claims before us.
 
 
 3
 * California adopted an energy policy in the mid-1990s that broke new ground in important respects. Prior to the events at issue here, California consumers had long relied upon investor-owned utilities regulated by the California Public Utilities Commission ("CPUC") for the generation, transmission, and distribution of electricity. The traditional regulatory policy came under review in the mid-1990s, however, as ascendant free market philosophies and "changes in federal law intended to increase competition in the provision of electricity" prompted policymakers to rethink traditional assumptions underlying the market's structure. 1996 Cal. Adv. Legis. Serv. 854, *1 (Deering). Perhaps the culmination of this rethinking was California's decision in 1996 to initiate an aggressive market experiment to deregulate and to restructure its electricity markets. Noting the energy industry restructuring already underway, the California Legislature decided that reshaping the market for California energy could help provide competitive, lower cost and reliable electricity service, while preserving the state's commitment to developing diverse, environmentally sensitive electricity resources. Id. Assembly Bill 1890 ("AB 1890") established the legal structure for the deregulation and restructuring plan. Id.
 
 
 4
 That legislation formed two non-governmental entities to orchestrate the transmission and sale of electricity: the Independent System Operator ("ISO") and the Independent Power Exchange ("PX"), both of which are California non-profit, public benefit corporations. See 1996 Cal. Adv. Legis. Serv. 854. At the same time, the CPUC authorized the investorowned utilities to sell electricity generation plants to other entities, including to some of the parties in this litigation. Until it ceased operations in 2001, the PX was a crucial hub of the electricity generation market, overseeing an auction system for the sale and purchase of electricity on a nondiscriminatory basis to meet the electricity loads of exchange customers. As a public utility under the Federal Power Act ("FPA"), 16 U.S.C. § 791a et seq., the PX was subject to the jurisdiction of the Federal Energy Regulatory Commission ("FERC"), and it operated pursuant to FERC-approved tariffs and FERC-approved wholesale rate schedules.
 
 
 5
 Responsibility in turn for the efficient functioning of the high-voltage transmission grid fell to the ISO, which operates to this day. The ISO manages the flow of electricity across the grid and balances supply and demand in real time. Its operations are governed by a Tariff and Protocols on file with and approved by FERC. To maintain the grid, the ISO procures both "imbalance energy" (energy needed to balance the grid) and ancillary services ("operating reserves" or "reserve capacity") through various market auction processes. Such procurement ensures that generation (i.e., supply) and load (i.e., demand) remain in balance at all times. Producers that seek to sell imbalance energy or ancillary services to the ISO enter a standard agreement with the ISO. The ISO also designates and authorizes entities as "scheduling coordinators," which represent producers and purchasers and submit energy schedules to the ISO specifying predicted energy production and usage over the next day. The scheduling coordinators enter a standard agreement and are the only entities that can submit bids to sell imbalance energy and ancillary services to the ISO.
 
 
 6
 Imbalance energy and ancillary services are distinct products procured through different market programs. The imbalance energy market is the so-called "real time" market, in which bids to supply energy are made no later than 45 minutes prior to the operating hour. The ISO ranks the supply bids and purchases the required energy, paying all successful suppliers at the market-clearing price. Ancillary services, in contrast, represent generating capacity that can be converted to energy and delivered to the grid in response to uncertain events, such as major plant outages, upon receiving an ISO dispatch order. The ancillary services supplier warrants that it will comply with ISO dispatch orders if the bid is accepted. Accordingly, it must hold its capacity in reserve during the potential production period, and it receives payment for doing so, even if no dispatch order is made. Thus, if the ISO orders the producer to supply energy, the supplier receives payment both for its withheld capacity and for the energy it was called upon to supply. The ISO's operations are governed by a tariff on file with and approved by FERC.
 
 B
 
 7
 At issue in this litigation are the producers' and scheduling coordinators' activities in the ancillary services market, particularly as brought to light during the electricity crises of 2000 and 2001. According to the state, the crises created rolling blackouts, endangered citizens' health and safety, damaged the state's economy, and were resolved only by the state's purchase of expensive alternative long-term energy contracts. California partly blames the allegedly fraudulent business practices of several producers and traders of wholesale electricity (including all appellees, collectively, the "companies") for the crisis, and it has filed numerous lawsuits against them, of which these are but a few. The cases consolidated before us state California's causes of action against the companies for violating state unfair competition law with respect to the ancillary services market.
 
 
 8
 Put succinctly, California claims that the producers fraudulently sold energy on the spot market from reserve capacity that they had contracted to hold in reserve. California claims that although the companies received payment for their commitment of reserve capacity, they were often unable to respond to ISO dispatch orders when called upon to remedy market imbalances. Because the grid's stability requires that the ISO balance electricity supply with demand on the grid, on an hourly basis, and because the companies were allegedly unable to respond to dispatch orders, the ISO was forced to attempt to find alternative energy sources during the periods of shortage. According to this theory, the companies' unauthorized sale of ancillary services energy threatened the stability of the grid system and left residents of the state vulnerable to blackouts and other disruptions.
 
 C
 
 9
 There are two district court orders now before us on appeal, and it is necessary to trace the history of the litigation to understand their significance. The Attorney General of California filed lawsuits in San Francisco County Superior Court, seeking injunctions, restitution, disgorgement, and civil penalties against multiple companies for double-selling reserve generation capacity in violation of the California Business & Professions Code. See CAL. BUS. & PROF. CODE § 17200 et seq. The companies removed the cases to the U.S. District Court for the Northern District of California. California then moved to remand, reasoning that the district court lacked subject matter jurisdiction and that California enjoyed sovereign immunity under the Eleventh Amendment, which, it contends, barred the district court from exercising jurisdiction. See 28 U.S.C. § 1447(c); U.S. CONST. amend. XI. The companies opposed the remand motions and also moved to dismiss. The district court denied the remand motions on August 6, 2002.
 
 
 10
 California filed notices of appeal (the "interlocutory appeals") and moved to stay further district court proceedings. In turn, the companies moved in district court to certify the interlocutory appeals as frivolous. Meanwhile, California filed an emergency motion in this court to stay further district court proceedings. That same day, a motions panel consolidated California's interlocutory appeals (along with several related cases). While our court was in the process of scheduling briefing and hearing of the interlocutory appeals, the district court denied the motion to stay and granted the companies' motion to certify the interlocutory appeals as frivolous. California then filed a second emergency motion for a temporary stay with this Court, seeking to prevent the District Court from ruling on the pending motions to dismiss. A motions panel denied both pending emergency motions.
 
 
 11
 The companies next moved to dismiss the interlocutory appeals for lack of appellate jurisdiction, or alternatively to strike part of the opening brief. A motions panel denied the motion to dismiss without prejudice and referred the motion to strike to the merits panel. Several collateral claims were also settled and dismissed voluntarily. The motions panel set an expedited schedule for briefing and hearing of the interlocutory appeals.
 
 
 12
 On March 25, 2003, before the briefing of the interlocutory appeals was complete, the District Court granted the companies' motion to dismiss and directed entry of final judgment on the merits. California timely appealed and also moved to stay the interlocutory appeals, to consolidate them with the appeal from the district court's final judgment on the merits, and to expedite briefing and hearing of these appeals. On April 9, 2003 a motions panel granted this motion in its entirety, and the consolidated appeals were duly set for expedited argument before us.[1]
 
 
 13
 Before us, then, are appeals from two orders: the district court's denial of remand to state court and its dismissal of California's unfair competition claims on the merits.
 
 II
 
 14
 We must first decide whether the district court had removal jurisdiction over this action.[2] See 28 U.S.C. § 1447(c). First, California contends that the district lacked jurisdiction under 28 U.S.C. § 1331 and 16 U.S.C. § 825p; and second, it urges that the Eleventh Amendment also bars removal. We consider each issue in turn.
 
 
 15
 * 1
 
 
 16
 "The jurisdictional structure at issue in this case has remained basically unchanged for the past century." Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 7, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). Subject to certain exceptions not applicable here, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). If the district court at any time determines that it lacks jurisdiction over the removed action, it must remedy the improvident grant of removal by remanding the action to state court. 28 U.S.C. § 1447; see ARCO Envtl. Remediation, LLC v. Dep't of Health and Envtl. Quality, 213 F.3d 1108, 1113 (9th Cir.2000). The removal statute is strictly construed against removal jurisdiction, and the burden of establishing federal jurisdiction falls to the party invoking the statute. Ethridge v. Harbor House Rest., 861 F.2d 1389, 1393 (9th Cir.1988).[3]
 
 
 17
 We confront in this case what Justice Frankfurter termed the "litigation-provoking problem," Textile Workers v. Lincoln Mills, 353 U.S. 448, 470, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957) (Frankfurter, J., dissenting), of "the presence of a federal issue in a state-created cause of action." Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804, 809-810, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986). In determining the presence or absence of federal jurisdiction, we apply the "`well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." Caterpillar Inc. v. Williams, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987); see also Louisville & Nashville R. Co. v. Mottley, 211 U.S. 149, 152, 29 S.Ct. 42, 53 L.Ed. 126 (1908). "A defense is not part of a plaintiff's properly pleaded statement of his or her claim." Rivet v. Regions Bank, 522 U.S. 470, 475, 118 S.Ct. 921, 139 L.Ed.2d 912 (1998); see Franchise Tax, 463 U.S. at 10-11, 103 S.Ct. 2841("[A] federal court does not have original jurisdiction over a case in which the complaint presents a state-law cause of action, but also asserts that federal law deprives the defendant of a defense he may raise, or that a federal defense the defendant may raise is not sufficient to defeat the claim." (internal citations omitted)). Rather, "a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action." Gully v. First Nat'l Bank in Meridian, 299 U.S. 109, 112, 57 S.Ct. 96, 81 L.Ed. 70 (1936). The federal issue "must be disclosed upon the face of the complaint, unaided by the answer or by the petition for removal." Id. at 113, 57 S.Ct. 96(noting that the federal controversy cannot be "merely a possible or conjectural one"). Thus the rule enables the plaintiff, as "master of the complaint," to "choose to have the cause heard in state court" "by eschewing claims based on federal law." Caterpillar, 482 U.S. at 399, 107 S.Ct. 2425.
 
 2
 
 18
 California chose the forum of its own state courts by stating its claims exclusively under California unfair competition laws, which prohibit "any unlawful, unfair, or fraudulent business act or practice," CAL. BUS. & PROF. CODE § 17200, and alleging that the companies converted generation capacity contractually owed to the state.[4] While it repeatedly cites the ISO tariff filed with FERC, it asserts no federal cause of action as such. Nor, though, does the complaint disguise the fact that the ISO tariff binds the companies to important obligations and duties that are relevant and necessary to the state law claim.
 
 
 19
 Pursuant to the FPA, the ISO must file schedules showing its rates and charges, and the practices and regulations affecting such charges. 16 U.S.C. § 824d(c). The filing enables FERC to determine whether the ISO rules and regulations pertaining to those charges are reasonable, as required by the FPA. See 16 U.S.C. § 824d(a). Once filed with a federal agency, such tariffs are the "equivalent of a federal regulation." Cahnmann v. Sprint Corp., 133 F.3d 484, 488(7th Cir. 1998); see Evanns v. AT & T Corp., 229 F.3d 837, 840 & n. 9 (9th Cir.2000). Thus, the tariff obligates the generators to maintain specified reserve capacity in the ancillary services market and bars them from producing output except when directed by an ISO dispatch order. Besides specifying the generators' responsibilities, the tariff also details penalties and remedies for non-compliance.
 
 
 20
 In denying California's motion to remand to state court, the district court reasoned simply that the complaint presented no independent state law claim. It was, in effect, an attempt to enforce federal tariffs. The claims were necessarily federal in character, and the conduct the state sought to condemn was expressly governed by the ISO tariffs.
 
 3
 
 21
 California now asserts, as it did before the district court, that the Supreme Court's decision in Pan American Petroleum Corp. v. Superior Court of Delaware, 366 U.S. 656, 81 S.Ct. 1303, 6 L.Ed.2d 584 (1960), and the well-pleaded complaint rule, require remand. The companies, by contrast, point, inter alia, to Sparta Surgical Corp. v. National Association of Securities Dealers, 159 F.3d 1209 (9th Cir. 1998). Both cases are relevant to the meaning and applicability of the FPA's exclusive jurisdiction provision, see 16 U.S.C. § 825p, and we confront this question first.
 
 
 22
 * The FPA applies to "the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b); see also id. at § 824(d)(defining "sale of electric energy at wholesale"). Section 317 of the FPA, 16 U.S.C. § 825p, consists, in pertinent part, of the following jurisdictional provision:
 
 
 23
 The District Courts of the United States ... shall have exclusive jurisdiction of violations of this chapter or the rules, regulations, and orders thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of, this chapter or any rule, regulation, or order thereunder.
 
 
 24
 16 U.S.C. § 825p. Because a violation of or suit to enforce the tariff, which has the same effect as an order or regulation, plainly falls within the language of § 825p, the companies contend that our jurisdictional inquiry can end here. See T & E Pastorino Nursery v. Duke Energy Trading & Mktg., L.L.C., 268 F.Supp.2d 1240, 1245-47 (S.D.Cal.2003) (denying remand of state unfair trade practices claim alleging violations of tariff governing ancillary services market).
 
 
 25
 b
 
 
 26
 We addressed an analogous question in Sparta. Sparta interprets a similarly worded jurisdictional provision within the Securities Exchange Act of 1934 ("Exchange Act"). See 15 U.S.C. § 78aa.[5] The Exchange Act authorizes the National Association of Securities Dealers ("NASD") to adopt rules and by-laws governing its association, among which include the decision to list, not to list, or to de-list an offering. Sparta, 159 F.3d at 1212. The plaintiff in Sparta filed a state court suit alleging "a variety of state common-law claims, including breach of express and implied contract, breach of the covenant of good faith and fair dealing, gross negligence, intentional misrepresentation, negligent misrepresentation, and interference with economic relations" against NASD and the Nasdaq Stock Market, Inc. ("NASDAQ"). Id. at 1211. The gravamen of the allegation was that the NASD and NASDAQ had improperly de-listed and suspended trading in Sparta stock on the opening day of the firm's public offering, rendering the offering unmarketable.
 
 
 27
 The defendants removed to federal district court, which, we concluded, had properly exercised jurisdiction over the action. We explained that though the plaintiff framed its lawsuit as a state law claim, the alleged misconduct in its treatment of offering "must be exclusively determined by federal law" because the viability of the claim "depends on whether the association's rules were violated." Id. at 1212. Indeed, we explained: "If NASD's action conformed to the rules, there can be no viable cause of action; if its action violated the rules, any claim falls under the imperative of 15 U.S.C. § 78aa which grants the federal courts `exclusive jurisdiction of violations of this chapter of the rules and regulations thereunder....'" Id. We reasoned that"[t]he rule that state law claims cannot be alchemized into federal causes of action by incidental reference ... has no application when relief is partially predicated on a subject matter committed exclusively to federal jurisdiction." Id. at 1212-13. See generally Lippitt v. Raymond James Fin. Servs., 340 F.3d 1033, 1042-43(9th Cir.2003) ("A careful reading of artful pleading cases shows that no specific recipe exists for a court to alchemize a state claim into a federal claim — a court must look at a complex group of factors in any particular case to decide whether a state claim actually `arises' under federal law.").
 
 
 28
 In the case before us, as in Sparta, relief is "predicated on a subject matter committed exclusively to federal jurisdiction." Id. at 1213. The state lawsuit turns, entirely, upon the defendant's compliance with a federal regulation.[6] The tariff defines the companies' contractual obligation with respect to the conduct at issue. Absent a violation of the FERC-filed tariff, no state law liability could survive.[7]
 
 
 29
 c
 
 
 30
 Despite Sparta, California argues that no federal jurisdiction lies because there is no statutorily conferred right of action in federal court. Ordinarily, of course, federal jurisdiction does not lie under 28 U.S.C. § 1331 where there is no right of action conferred by federal statute. See Merrell Dow Pharmaceuticals v. Thompson, 478 U.S. 804, 817, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986) ("[A] complaint alleging a violation of a federal statute as an element of a state cause of action, when Congress has determined that there should be no private, federal cause of action for the violation, does not state a claim `arising under the Constitution, laws, or treaties of the United States.'" (citing 28 U.S.C. § 1331)); see also Utley v. Varian Assoc., 811 F.2d 1279, 1283 (9th Cir.1987). Sparta establishes, however, that the exclusive jurisdiction provision takes the case outside of the rule of Merrell Dow and Utley, which otherwise might bar the action if the only jurisdictional provision implicated were 28 U.S.C. § 1331. Because there was no federal cause of action for Sparta's claim, there would have been no jurisdiction predicated solely on 28 U.S.C. § 1331. Sparta, 159 F.3d at 1212. Yet the claim lay "not under 28 U.S.C. § 1331, but under 15 U.S.C. § 78aa." Id. "Thus, neither Merrell Dow nor Utley divested the district court of jurisdiction...." Id. Similarly, in the case before us, the exclusive jurisdiction provision seemingly falls within our court's Sparta exception to Merrell Dow and Utley.
 
 
 31
 d
 
 
 32
 California also argues that Pan American Petroleum Corp. v. Superior Court of Delaware, 366 U.S. 656, 81 S.Ct. 1303, 6 L.Ed.2d 584 (1960), requires remand. Pan American, decided under the Natural Gas Act, 15 U.S.C. 717 et seq.,[8] addressed a substantially identical exclusive jurisdiction provision.[9] At issue in Pan American was a common law contract dispute between a natural gas producer (Pan American) and a pipeline and distribution company (Cities Service). After the parties contracted to transact at an agreed-upon price, the Corporation Commission of the State of Kansas adopted a minimum-rate order that altered the price. Pan American, 366 U.S. at 658, 81 S.Ct. 1303. Cities Service wrote Pan American a letter stating that it would pay the higher rate, but explained that it would expect a refund if it prevailed in its legal challenge to the minimum rate order. Pan American accepted payment on these terms. After this supplemental agreement, the Federal Power Commission (the predecessor to FERC) filed an order requiring independent producers to file rate schedules, defined to include basic contracts and all supplements and amendments. Id. at 660, 81 S.Ct. 1303; see Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954) (extending jurisdiction of Federal Power Commission). The original contract was filed, though the supplemental letter was not attached. After the Kansas rate-order was found invalid, see Cities Service Gas Co. v. State Corporation Comm., 355 U.S. 391, 78 S.Ct. 381, 2 L.Ed.2d 355 (1958), Cities Service sued in Delaware state court to recover its overpayment, and the Court was asked to decide whether the Delaware court had jurisdiction over the action. Pan American, 366 U.S. at 660-61, 81 S.Ct. 1303.
 
 
 33
 According to the Court, the state court claim did not fall within the purview of exclusive federal jurisdiction, and the state properly exercised jurisdiction. The Court explained: "We are not called upon to decide the extent to which the Natural Gas Act reinforces or abrogates the private contract rights here in controversy. The fact that [plaintiff] sues in contract or quasicontract, not the ultimate validity of its arguments, is decisive." Pan American, 366 U.S. at 664, 81 S.Ct. 1303. Because the complaint merely demanded recovery on alleged contracts to refund overpayment, or for restitution of unjust enrichment, the court concluded that "[n]o right is asserted under the Natural Gas Act." Pan American, 366 U.S. at 662-63, 81 S.Ct. 1303.
 
 
 34
 Pan American is distinguishable from the case before us. The Pan American court's holding is unremarkable insofar as it held that cases falling outside the scope of the exclusive jurisdiction provision are not subject to it. The Court gave only modest attention to whether the contract had been filed, in whole or in part, pursuant to the Federal Power Commission order. This does not surprise, given that the alleged private contract at issue — in effect, an option contract based on a future litigation event — did not implicate the federal regulatory regime. Pan American, 366 U.S. at 663, 81 S.Ct. 1303("The rights asserted by Cities Services are traditional common-law claims. They do not lose their character because it is common knowledge that there exists a scheme of federal regulation of interstate transmission of natural gas."). And, in fact, the supplemental letter bore only an attenuated connection to the filed original contract. Id. at 660, 81 S.Ct. 1303.[10]
 
 
 35
 By contrast, the tariffs here directly implicate the federal regulatory regime, were filed with FERC, and concern obligations directly and exclusively arising under regulations issued pursuant to the FPA. California's state claim represented a naked attempt to enforce these federal obligations. Accordingly, we hold, as compelled by Sparta, that removal jurisdiction lies over a claim to enforce obligations that squarely fall within the exclusive jurisdiction provision of the Federal Power Act. See 16 U.S.C. § 825p.[11]
 
 B
 
 36
 California also claims that Eleventh Amendment sovereign immunity bars removal of its lawsuit to the federal courts. Though the State is a plaintiff in this action, rather than a defendant being subject to suit, California presents the novel (at least in this court) contention that principles of sovereign immunity are violated when a plaintiff state, voluntarily prosecuting a claim, is forced without its consent into a federal forum by operation of the federal removal statute.[12]
 
 
 37
 * The relationship between the Eleventh Amendment and state sovereign immunity is not as simple as it may sound.
 
 
 38
 While our approach to constitutional interpretation ordinarily requires us to begin with the text of the pertinent provision, the Supreme Court has emphasized that "the sovereign immunity reflected in (rather than created by) the Eleventh Amendment transcends the narrow text of the Amendment itself." College Sav. Bank v. Fla. Prepaid Postsecondary Ed. Expense Bd., 527 U.S. 666, 688, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) (describing the "whole point" of the Supreme Court's decision in Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890)). Consistent with this conception, the Court has repeatedly recognized sovereign immunity outside the literal text of the Eleventh Amendment. See, e.g., Alden v. Maine, 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) (holding state immune from suit brought in state court); Seminole Tribe of Florida v. Florida, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (holding state immune from suit involving a federal question); Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890) (holding state immune from suit brought by its own citizens). Thus the Supreme Court has "understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition ... which it confirms." Seminole Tribe, 517 U.S. at 54, 116 S.Ct. 1114(quoting Blatchford v. Native Vill. of Noatak, 501 U.S. 775, 779, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991)). This presupposition is that sovereign immunity pre-existed the Amendment; accordingly, "the sovereign immunity of the States neither derives from nor is limited by the terms of the Eleventh Amendment." Alden, 527 U.S. at 713, 119 S.Ct. 2240. Indeed, as we have often been reminded, see Alden, 527 U.S. at 722, 119 S.Ct. 2240; Hans, 134 U.S. at 11, 10 S.Ct. 504, the Amendment's passage represented not the enshrinement of new doctrine but rather correction of the Supreme Court's misstep in Chisholm v. Georgia, 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793), which occasioned a nationwide "shock of surprise" and led swiftly to the Eleventh Amendment's ratification. See Alden, 527 U.S. at 722, 119 S.Ct. 2240; College Sav. Bank, 527 U.S. at 669, 119 S.Ct. 2219("Though its precise terms bar only federal jurisdiction over suits brought against one State by citizens of another State or foreign state, we have long recognized that the Eleventh Amendment accomplished much more: It repudiated the central premise of Chisholm that the jurisdictional heads of Article III superseded the sovereign immunity that the States possessed before entering the Union."); Hans, 134 U.S. at 11, 10 S.Ct. 504. Thus, despite the language of the Eleventh Amendment, we have long understood that "the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today ... except as altered by the plan of the Convention or certain constitutional Amendments." Alden, 527 U.S. at 713, 119 S.Ct. 2240.
 
 2
 
 39
 Cognizant that the Eleventh Amendment can only be understood in this context, we turn to its language, recognizing that while but a reflection of underlying principle, see College Sav. Bank, 527 U.S. at 688, 119 S.Ct. 2219, it can nonetheless prove helpful in answering the question before us. That Amendment provides:
 
 
 40
 The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
 
 
 41
 U.S. CONST. amend. XI. Indisputably, the Amendment limits the reach of federal judicial power to suits "commenced or prosecuted against one of the United States." Id. (emphasis added). It plainly protects states from being haled into federal courts as defendants. The State nevertheless urges that sovereign immunity extends even more broadly to litigation commenced by states — as plaintiffs, not defendants — when such suits are removed to federal court without the plaintiff state's consent. California's argument, in effect, is that involuntary removal is the constitutional equivalent of bringing or commencing a suit against it, or that sovereign immunity otherwise bars the same action.
 
 
 42
 * While we have not previously explored the intersection of state sovereign immunity and removal jurisdiction when the state is a plaintiff, the Supreme Court and the constitutional framers have set down ample guideposts to shepherd our analysis. Fewer than 30 years after the Eleventh Amendment's ratification in 1795, the Court decided Cohens v. Virginia, 19 U.S. (6 Wheat) 264, 407, 5 L.Ed. 257 (1821), which posed the question whether certain individuals, who had been convicted in Virginia state court for selling District of Columbia lottery tickets in violation of Virginia state law, could pursue a writ of error in the Supreme Court to assert a theory that the Supremacy Clause barred any prosecution because the lottery had been authorized by Congress. Virginia urged that it was being sued without its consent and sought to invoke the protections of Eleventh Amendment sovereign immunity. In addressing Virginia's Eleventh Amendment claim, Chief Justice Marshall explored what it means to commence or to prosecute a suit:
 
 
 43
 To commence a suit, is to demand something by the institution of process in a Court of justice; and to prosecute the suit, is, according to the common acceptation of language, to continue that demand. By a suit commenced by an individual against a State, we should understand process sued out by that individual against the State, for the purpose of establishing some claim against it by the judgment of a Court; and the prosecution of that suit is its continuance. Whatever may be the stages of its progress, the actor is still the same.
 
 
 44
 Id. at 408 (emphasis added). While observing that the judicial power does not "extend to any suit which may be commenced 8853 [or prosecuted] against a State by the citizen of another State," id. (emphasis added), the Court held explicitly that the amendment does not reach suits initiated by States. Id. at 407 ("The amendment, therefore, extended to suits commenced or prosecuted by individuals, but not to those brought by States." (emphasis added)). This applied even though Virginia initiated its suit in state court. Id. at 409("If a suit, brought in one Court, and carried by legal process to a supervising Court, be a continuation of the same suit, then this suit is not commenced nor prosecuted against a State."). The Supreme Court, accordingly, rejected the state's claim of sovereign immunity:
 
 
 45
 [T]he defendant who removes a judgment rendered against him by a State Court into this Court, for the purpose of re-examining the question, whether that judgment be in violation of the constitution or laws of the United States, does not commence or prosecute a suit against the State, whatever may be its opinion where the effect of the writ may be to restore the party to the possession of a thing which he demands.
 
 
 46
 Id. at 412.
 
 
 47
 While addressing the question of appellate jurisdiction, Cohens counsels strongly that removal does not constitute the commencement or prosecution of a suit. California argues, however, that Cohens not only involved the dissimilar circumstances of writ jurisdiction, rather than the involuntary removal provisions not yet enacted, but see Charles A. Wright et al., FEDERAL PRACTICE AND PROCEDURE § 3721, at 289(3d ed.1998) (noting existence of limited removal provisions since the Judiciary Act of 1789, 1 Stat. 73, 79-80 (1789)), but also predated a more expansive conception of the Eleventh Amendment, particularly that inaugurated by Hans in 1890.
 
 
 48
 Subsequent Eleventh Amendment jurisprudence, however, does little to disturb the principle enunciated by Cohens that plaintiff states may not invoke the Amendment. In Ames v. Kansas, 111 U.S. 449, 4 S.Ct. 437, 28 L.Ed. 482 (1884), addressing the "arising under" removal provision of the Act of March 3, 1875, see 18 Stat. 470, 470-71, the Court considered "the question whether a suit brought by a State in one of its own courts, against a corporation amenable to its own process, to try the right of the corporation to exercise corporate powers within the territorial limits of the State, can be removed to the Circuit Court of the United States...." Ames, 111 U.S. at 462, 4 S.Ct. 437. While it made only a brief explicit mention of the Eleventh Amendment, see id. at 466, 4 S.Ct. 437, the Ames Court addressed a similar argument to that offered by the State here:
 
 
 49
 The [] question we have to consider is, therefore, whether suits cognizable in the courts of the United States on account of the nature of the controversy, and which need not be brought originally in the Supreme Court, may now be brought in or removed to the Circuit Courts without regard to the character of the parties. All admit that the act does give the requisite jurisdiction in suits where a State is not a party, so that the real question is, whether the Constitution exempts the States from its operation.
 
 
 50
 Id. at 470, 4 S.Ct. 437. Noting that "[t]he same exemption was claimed in Cohens v. Virginia, 6 Wheat. 294, to show that the appellate jurisdiction of this court did not extend to the review of the judgments of a State court in a suit by a State against one of its citizens," Ames, 111 U.S. at 470, 4 S.Ct. 437, the court rejected the state's claim. Id. ("[T]he argument would have great force if urged to prove that this court could not establish the demand of a citizen upon his State, but is not entitled to the same force, when urged to prove that this court cannot inquire whether the Constitution or laws of the United States protect a citizen from a prosecution instituted against him by a State." (quoting Cohens, 19 U.S. at 391, 19 U.S. 264 (Marshall, C.J.))).
 
 
 51
 While the Ames decision pre-dates Hans, Ames was relied upon by the Supreme Court in Illinois v. Milwaukee, 406 U.S. 91, 100-01, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972). In that matter, the relevant question was whether the federal district court had jurisdiction under 28 U.S.C. § 1331(a) to entertain suit by the State of Illinois against certain non-state political subdivisions in Wisconsin. Id. at 98-101, 92 S.Ct. 1385. Though Ames's sovereign immunity analysis was not necessary to the Court's holding in Illinois, the court betrayed no hint that Ames had fallen into disfavor:
 
 
 52
 As respects the power of a State to bring an action under § 1331(a), Ames v. Kansas, 111 U.S. 449, 470-472, 4 S.Ct. 437, 28 L.Ed. 482, is controlling. There Kansas had sued a number of corporations in its own courts and, since federal rights were involved, the defendants had the cases removed to the federal court. Kansas resisted, saying that the federal court lacked jurisdiction because of Art. III, § 2, cl. 2, of the Constitution, which gives this Court "original Jurisdiction" in "all Cases ... in which a State shall be Party." The Court held that where a State is suing parties who are not other States, the original jurisdiction of this Court is not exclusive (id., at 470, 4 S.Ct. 437) and that those suits "may now be brought in or removed to the Circuit Courts [now the District Courts] without regard to the character of the parties." Ibid. We adhere to that ruling.
 
 
 53
 Illinois, 406 U.S. at 100-01, 92 S.Ct. 1385 (footnotes omitted) (alterations in original).
 
 
 54
 b
 
 
 55
 Since Ames the Court has, on several occasions, reviewed in detail the meaning, purpose and history of sovereign immunity and the Eleventh Amendment. See, e.g., Alden, 527 U.S. at 715, 119 S.Ct. 2240; Hans, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842.
 
 
 56
 This history gives little indication that sovereign immunity was ever intended to protect plaintiff states. Rather, it plainly understands sovereign immunity as protection from being sued. Even before what little debate the Eleventh Amendment stirred, the constitutional ratification debate probed in detail the meaning of Article III, section 2 of the Constitution, which some feared, by authorizing federal jurisdiction over cases "between a State and Citizens of another State," would subject states to suit by out-of-state creditors and infringe their immunity from suit.[13] Alden, 527 U.S. at 716, 119 S.Ct. 2240; Hans, 134 U.S. at 12-14, 10 S.Ct. 504. "Although the state conventions which addressed the issue of sovereign immunity in their formal ratification documents sought to clarify the point by constitutional amendment, they made clear that they, like Hamilton, Madison, and Marshall, understood the Constitution as drafted to preserve the States' immunity from private suits." Alden, 527 U.S. at 718, 119 S.Ct. 2240 (emphasis added). Thus, for example, the ratification documents of New York and Rhode Island both proclaimed "[t]hat the judicial power of the United States, in cases in which a state may be a party, does not extend to criminal prosecutions, or to authorize any suit by any person against a state." 1 DEBATES ON THE FEDERAL CONSTITUTION 329 (J. Elliot 2d ed. 1854) (quoted in Alden, 527 U.S. at 719, 119 S.Ct. 2240) (New York); 1 id. at 336, 119 S.Ct. 2240 (quoted in Alden, 527 U.S. at 719, 119 S.Ct. 2240) (Maine).
 
 
 57
 The Court has, in turn, described "suits for money damages against the State[s]" as "the heart of the Eleventh Amendment's concern." Lapides v. Bd. of Regents, 535 U.S. 613, 620, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002); see generally Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 102, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) ("The general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." (internal citations and quotations omitted)).
 
 
 58
 Nonetheless, the State contends that removal forces a state to appear against its will in the court of another sovereign, and that sovereign immunity broadly protects "the states' litigation choices." It is long-settled, though, that "[a]lthough a State may not be sued without its consent, such immunity is a privilege which may be waived," Gunter v. Atl. C.L.R. Co., 200 U.S. 273, 284, 26 S.Ct. 252, 50 L.Ed. 477 (1906), "by consenting to suit." Coll. Sav. Bank, 527 U.S. at 670, 119 S.Ct. 2219(citing Clark v. Barnard, 108 U.S. 436, 447-448, 2 S.Ct. 878, 27 L.Ed. 780(state's voluntary appearance in federal court avoids sovereign immunity inquiry)). "[H]ence where a State voluntarily becomes a party to a cause and submits its rights for judicial determination, it will be bound thereby and cannot escape the result of its own voluntary act by invoking the prohibitions of the Eleventh Amendment." Gunter, 200 U.S. at 284, 26 S.Ct. 252(finding waiver where state sues in federal court). While California's hope was to avoid the federal forum, it voluntarily appeared in state court to press its claims against the companies, who predictably sought removal to what they perceived to be a more favorable forum for the adjudication of claims involving federal law. Waiver by litigation conduct "rests upon the Amendment's presumed recognition of the judicial need to avoid inconsistency, anomaly, and unfairness, and not upon a State's actual preference or desire, which might, after all, favor selective use of `immunity' to achieve litigation advantages." Lapides, 535 U.S. at 620, 122 S.Ct. 1640 (citing Wis. Dep't. of Corr. v. Schacht, 524 U.S. 381, 393, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998) (Kennedy, J., concurring)) (finding waiver when state is involuntarily made a party in state court and subsequently seeks removal to federal court).
 
 3
 
 59
 For the foregoing reasons, we hold that a state that voluntarily brings suit as a plaintiff in state court cannot invoke the Eleventh Amendment when the defendant seeks removal to a federal court of competent jurisdiction. In so holding, our conclusion is consistent with those of our sister circuits.[14] See Oklahoma ex rel. Edmondson v. Magnolia Marine Transp. Co., 359 F.3d 1237, 1239 (10th Cir.2004) ("[T]he Eleventh Amendment's abrogation of federal judicial power `over any suit ... commenced or prosecuted against one of the United States' does not apply to suits commenced or prosecuted by a State."); Regents of Univ. of Cal. v. Eli Lilly & Co., 119 F.3d 1559, 1564 (Fed.Cir.1997) ("[T]he Eleventh Amendment applies to suits `against' a state, not suits by a state."); Huber, Hunt & Nichols, Inc. v. Architectural Stone Co., 625 F.2d 22, 24 n. 6 (5th Cir.1980) ("Of course, the eleventh amendment is inapplicable where a state is a plaintiff...."). Similarly, numerous district courts have adhered to this view. See also, e.g., In re Rezulin Prods. Liab. Litig., 133 F.Supp.2d 272, 297 (S.D.N.Y.2001) ("[W]hile the Eleventh Amendment in some areas has been extended beyond its textual limits, this is not the case with respect to state plaintiffs."); Vermont v. Oncor Communications, Inc., 166 F.R.D. 313, 321 (D.Vt.1996) ("The Eleventh Amendment does not bar removal of an action involving a federal question in which a state is the plaintiff."); Regents of the Univ. of Minn. v. Glaxo Wellcome, Inc., 58 F.Supp.2d 1036, 1039 (D.Minn.1999) ("A number of recent cases directly refute plaintiff's argument that this case may not be removed from state to federal court.") (collecting district court cases).[15]
 
 
 60
 California's conception of sovereign immunity as a sword rather than a shield is unavailing.
 
 III
 
 61
 Having resolved the jurisdictional issues, we now turn to the merits. The district court dismissed California's claims as barred by federal preemption and, in the alternative, the filed rate doctrine. California challenges both determinations. We address each in turn.[16]
 
 
 62
 * "Federal preemption of state law is rooted in the Supremacy Clause, Article VI, clause 2, of the United States Constitution." Transmission Agency of California v. Sierra Pacific Power Co., 295 F.3d 918, 928 (9th Cir.2002) (hereinafter "TANC"). "Preemption of state law `is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" Id. (quoting Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977)).
 
 
 63
 In the absence of express preemption, federal law may pre-empt state claims in two ways, both of which the district court held barred California's claim. Under field preemption, "[i]f Congress evidences an intent to occupy a given field, any state law falling within that field is preempted." Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). Alternatively, there is conflict preemption: "[i]f Congress has not entirely displaced state regulation over the matter in question, state law is still pre-empted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." Id. (internal citations omitted).
 
 
 64
 The FPA applies to "the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b), (d). "Part II of the Federal Power Act, codified at 16 U.S.C. §§ 824-824m, delegates to the Federal Energy Commission `exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce.'" TANC, 295 F.3d at 928 (emphasis added) (quoting New England Power Co. v. New Hampshire, 455 U.S. 331, 340, 102 S.Ct. 1096, 71 L.Ed.2d 188 (1982)). Indeed, "FERC's exclusive jurisdiction extends over all facilities for such transmission or sale of electric energy." Duke Energy Trading & Mktg., L.L.C. v. Davis, 267 F.3d 1042, 1056 (9th Cir.2001). The scope of this authority is not amenable to case-by-case analysis, but rather represents a bright-line rule:
 
 
 65
 [Our] decisions have squarely rejected the view ... that the scope of FPC jurisdiction over interstate sales of gas or electricity at wholesale is to be determined by a case-by-case analysis of the impact of state regulation upon the national interest. Rather, Congress meant to draw a bright line easily ascertained, between state and federal jurisdiction, making unnecessary such case-by-case analysis. This was done in the Power Act by making FPC jurisdiction plenary and extending it to all wholesale sales in interstate commerce except those which Congress has made explicitly subject to regulation by the States.
 
 
 66
 FPC v. Southern California Edison Co., 376 U.S. 205, 215-216, 84 S.Ct. 644, 11 L.Ed.2d 638 (1964); see also Nantahala Power & Light Co. v. Thornburg, 476 U.S. 953, 966, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986).
 
 
 67
 California does not contest FERC's exclusive jurisdiction over interstate wholesale power rates; rather, it urges that such authority does not extend over every aspect of the wholesale market. See Duke Power Co. v. Federal Power Com., 401 F.2d 930, 935 (D.C.Cir.1968) ("[T]he Act's major emphasis is upon federal regulation of those aspects of the industry which — for reasons either legal or practical — are beyond the pale of effective state supervision."); Ting v. AT & T, 319 F.3d 1126, 1143 (9th Cir.2003) ("In deregulated markets, compliance with state law is the norm rather than the exception."). The FERC does not, according to California, have the requisite tools and institutional expertise of the State in policing fraudulent business practices. Cf. Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal.4th 163, 181, 83 Cal.Rptr.2d 548, 973 P.2d 527 (Cal.1999) (noting that the California law's "sweeping language" evidenced intent to combat "wrongful business conduct in whatever context such activity might occur" (internal citations omitted) (emphasis added)). To the extent that California's enforcement of its unfair business practices law may affect rates, this effect, California asserts, is merely an indirect consequence of state regulation whose purpose is to deter fraudulent and unfair conduct, not to regulate interstate wholesale power rates.[17] In support of its view that the FPA does not preempt such state regulation, California points to 16 U.S.C. § 824a(f), which reserves for states regulatory authority to the extent that it "does not conflict with the exercise of the Commission's powers under or relating to subsection (e) of this section."[18]
 
 
 68
 We cannot agree with California's theory that the State has regulatory authority over the specific tariff-governed conduct alleged in this case.[19] As we elaborate more fully below, our cases specifying the nature and scope of exclusive FERC jurisdiction make clear that the interstate "transmission" or "sale" of wholesale energy pursuant to a federal tariff — not merely the "rates" — falls within FERC's exclusive jurisdiction. States do, of course, have jurisdiction over certain sales, but we have enunciated a bright-line distinction between wholesale sales, which fall within FERC's plenary jurisdiction, and retail sales, over which the states exercise jurisdiction. See Duke Energy, 267 F.3d at 1056("Retail sales of electricity and wholesale intrastate sales are within the exclusive jurisdiction of the States ...."); see also id. ("`[I]nterstate power rates filed with FERC or fixed by FERC must be given binding effect' by state authorities in areas subject to state jurisdiction, e.g., retail sales; hence, FERC approved rates preempt conflicting regulations adopted by the States.") (citing Nantahala, 476 U.S. at 962, 106 S.Ct. 2349). Nor, for example, has the Court limited the file rate doctrine "to rates per se or FERC orders that deal in terms of prices or volumes or purchases." Duke Energy, 267 F.3d at 1056 (citing Nantahala, 476 U.S. at 966, 106 S.Ct. 2349).
 
 
 69
 Two leading cases in this area, Duke Energy and TANC, both support the view that California's lawsuit falls within the exclusive jurisdiction of FERC. In Duke Energy, in response to the same energy crises that form the factual background of this appeal, the Governor of California declared a state of emergency and commandeered the rights to certain long-term electricity contracts. Duke Energy, 267 F.3d at 1047. These wholesale contracts provided for liquidation of collateral in the event of non-performance, and the buyers, unable to pass through increased wholesale costs to their customers, had defaulted. Because the spot-market price of electricity had skyrocketed, the lower-price long-term contracts had substantial market value that threatened to evaporate. California sought to commandeer the longterm contracts to preserve their value. Id. at 1045-47; see Cal. Gov't Code § 8572. Because the commandeering order deprived the seller of financial security protection and assurance of payment, we concluded that "[t]he default mitigation and security provisions of the ... rate schedule, with which [the Governor's] commandeering orders directly conflict, [fell] well within FERC's exclusive jurisdiction over interstate wholesale electricity sales." Duke Energy, 267 F.3d at 1058. The Governor had "encroached upon FERC's exclusive authority." Id.
 
 
 70
 Similarly to the case before us, in Duke Energy California tried to exert authority over the substantive provisions of a FERC-approved tariff. Here, the tariff governing ancillary services includes explicit remedial provisions, over which FERC similarly has exclusive authority. While in Duke Energy California sought to alter the tariff terms by rendering null and void the liquidation provision, here California seeks to impose judicial remedies in addition to those that FERC may impose. In each case, California seeks to encroach upon authority entrusted exclusively to FERC by the FPA.[20]
 
 
 71
 In TANC, we held that the FPA preempted state law tort and property claims regarding the construction and operation of interconnections between various electricity interties in the Pacific Northwest. The Transmission Agency of Northern California ("TANC") alleged that the operation of the Alturas Intertie damaged or trespassed upon the California-Oregon Transmission Project. "FERC, however, approved the operation of the Alturas Intertie and its connection to" the intertie at issue. TANC, 295 F.3d at 928. In finding federal preemption, we explained that "TANC cannot obtain state law money damages allegedly resulting from the operation of an interstate electricity intertie expressly approved by FERC, where the manner of operation was necessarily contemplated at the time of approval." Id. Indeed, we reasoned that "FERC has approved the construction and operation of the Alturas Intertie, and FERC alone ... can modify that decision, or deal with any party who operates the Alturas Intertie improperly." Id. at 929. Thus, TANC, like Duke Energy, stands for the proposition that remedies for breach and non-performance of FERC approved operating agreements in the interstate wholesale electricity market fall within the exclusive domain of FERC.[21]
 
 
 72
 California's unfair competition claims are based on the companies' agreement to provide ancillary services, the terms of which are embodied in, and governed by, the ISO tariff, including its remedial provisions. Accordingly, we conclude that California claims are preempted because they encroach upon the substantive provisions of the tariff, an area reserved exclusively to FERC, both to enforce and to seek remedy.[22] See Duke Energy, 267 F.3d at 1057("[I]t is common ground that if FERC has jurisdiction over a subject, the States cannot have jurisdiction over the same subject.") (quoting Miss. Power & Light Co. v. Miss. Power ex rel. Moore, 487 U.S. 354, 377, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988) (Scalia, J. concurring)).[23]
 
 B
 
 73
 California's challenge to the district court's alternative holding based on the filed rate doctrine presents a closely related issue, and we address it separately, if briefly, because it reinforces our conclusion. See Entergy La., Inc. v. La. PSC, 539 U.S. 39, 47, 123 S.Ct. 2050, 156 L.Ed.2d 34 (2003) ("When the filed rate doctrine applies to state regulators, it does so as a matter of federal preemption through the Supremacy Clause."). "At its most basic, the filed rate doctrine provides that state law, and some federal law ... may not be used to invalidate a filed rate nor to assume a rate would be charged other than the rate adopted by the federal agency in question." TANC, 295 F.3d at 929. The filed rate doctrine, however, is "not limited to rates per se." Nantahala Power, 476 U.S. at 966, 106 S.Ct. 2349.
 
 
 74
 Under the filed rate doctrine, the terms of the filed tariff "are considered to be `the law' and to therefore `conclusively and exclusively enumerate the rights and liabilities'" of the contracting parties. Evanns v. AT & T Corp., 229 F.3d 837, 840 (9th Cir.2000) (citing Marcus v. AT & T Co., 138 F.3d 46, 56 (2d Cir.1998)); see also Evanns, 229 F.3d at 840 n. 9. As a result, "the filed rate doctrine bars all claims — state and federal — that attempt to challenge [the terms of a tariff] that a federal agency has reviewed and filed." County of Stanislaus v. Pacific Gas & Elec. Co., 114 F.3d 858, 866(9th Cir.1997); Evanns, 229 F.3d at 840. See also AT & T Co. v. Central Office Tel., Inc., 524 U.S. 214, 227-28, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998) (filed rate doctrine barred state law claims for breach of contract and tortious interference with contractual relations). Thus, to the extent that California argues that the companies owe "obligations ... beyond those set out in the filed tariffs ... [such claim] is also barred by the filed rate doctrine." Evanns, 229 F.3d at 841.
 
 
 75
 "[T]he filed rate doctrine's purpose is to ensure that the filed rates are the exclusive source of the terms and conditions by which the [regulated entity] provides ... the services covered by the tariff." Brown v. MCI WorldCom Network Servs., Inc., 277 F.3d 1166, 1170 (9th Cir. 2002) (internal citations omitted). To the extent that California is seeking to enforce the penalty provisions of the tariff, or to have them expanded,[24] this conflicts with the filed rate doctrine and the exclusive authority conferred to FERC to enforce its tariff.[25]
 
 IV
 
 76
 For the foregoing reasons, we affirm the district court's denial of the motions for remand, and we affirm its dismissal of the substantive claims.
 
 
 77
 AFFIRMED.
 
 
 
 Notes:
 
 
 *
 The court had deferred submission pending receipt of a bankruptcy court order granting limited relief from the automatic stay in the proceedings of Mirant Corporation and its affiliated debtors
 
 
 **
 At the time of submission as to the other parties, the appeal was not submitted as NRG Energy, Inc. ("NRG"), which was in bankruptcy proceedings, and whose appeal had accordingly been stayed by this court's order of May 30, 2003. The court vacated its stay on April 15, 2004, and, consistent with the parties' stipulation, deemed the case submitted as to NRG
 
 
 [1]
 On May 19, 2003, a motions panel granted the companies' motion to have a single merits panel hear several appeals involving other causes of action brought by California arising out of the energy crises. On May 30, 2003, however, the motions panel rescinded the order and established an accelerated briefing schedule for the ancillary services appeal before us. The other appeals were assigned to different merits panels
 
 
 [2]
 The companies argue that we lack appellate jurisdiction over the interlocutory appeals, and ask that the relevant portions of the state's brief be struckSee 28 U.S.C. § 1291(permitting appeals of "final decisions of the district courts"); Digital Equip. Corp. v. Desktop Direct, 511 U.S. 863, 868, 114 S.Ct. 1992, 128 L.Ed.2d 842 (1994) (noting that exceptions to the general rule permitting a single appeal are to be interpreted narrowly). Now that the interlocutory appeal has been consolidated with the district court's final judgment on the merits, this consolidated appeal constitutes the single appeal "in which claims of district court error at any stage of the litigation may be ventilated." Id. at 868, 114 S.Ct. 1992. Accordingly, we deny the motion to strike.
 
 
 [3]
 We review de novo the denial of a motion to remand an action to state court for want of removal jurisdictionEthridge, 861 F.2d at 1393.
 
 
 [4]
 The complaint claims the ISO has an exclusive possessory interest as to "all generating capacity it procures through the ancillary services markets. The ISO's interest includes the right to determine how much energy, if any, should be produced out of the capacity it has procured."
 
 
 [5]
 The Exchange Act provides:
 The district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this title or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this title or the rules and regulations thereunder.
 15 U.S.C. § 78aa.
 
 
 [6]
 The very face of California's complaint betrays that the gravamen of the complaint is the companies' alleged violations of federal tariff obligations. It repeatedly cites the federal tariff and alleges that the companies violated the agreement embodied within it. While California insists that the district court was obliged to remand if at least one independent state law theory of relief existed,see Duncan v. Stuetzle, 76 F.3d 1480, 1486 (9th Cir.1996) ("[I]f a single state-law based theory of relief can be offered for each of the three causes of action in the complaint, then the exercise of removal jurisdiction was improper."), we do not discern any such claim. According to California, the state unfair competition's disjunctive phrasing permits relief for practices that are either "unfair, unlawful, or fraudulent." See CAL. BUS. & PROF. CODE § 17200. With respect to unlawfulness, California urges that the companies improperly converted property to which the ISO had the exclusive right of possession and control. Yet this claim is based entirely on alleged tariff obligations (i) to hold ancillary services capacity in reserve prior to receipt of an ISO dispatch instruction and (ii) to comply with ISO's dispatch instructions. The federal tariff wholly governs the lawfulness of the companies' conduct. Similarly, with respect to the "unfair" and "fraudulent" terms, the claims depend entirely upon the federal tariff. Cf. Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal.4th 163, 182, 83 Cal.Rptr.2d 548, 973 P.2d 527 (Cal.1999) ("Courts may not simply impose their own notions of the day as to what is fair or unfair.").
 
 
 [7]
 California also citesLippitt v. Raymond James Fin. Servs., 340 F.3d 1033 (9th Cir. 2003), in which we reversed the district court's decision to retain removal jurisdiction. Lippitt involved a private attorney general's lawsuit under Cal. Bus. & Prof.Code § 17200 et seq. against several brokerage firms for sales and marketing practices associated with certain investment products. Lippitt, 340 F.3d at 1036. In that case, however, we found clear Congressional recognition of state competence in the securities field, see Lippitt, 340 F.3d at 1037 (citing 15 U.S. § 78bb), and explicitly distinguished Sparta, noting that "[u]nlike the situation[] in Sparta ... a state court need not inquire into NYSE regulations, or even refer to federal law, in the case before us." Lippitt, 340 F.3d at 1045. Here, by contrast, the reference to and necessity of relying upon federal law is unavoidable.
 
 
 [8]
 The FPA and the Natural Gas Act ("NGA") are similar statutory schemes, and that the Supreme Court has held that the applicable case law for the two Acts is often interchangeableSee Ark. La. Gas Co. v. Hall, 453 U.S. 571, 578 n. 8, 101 S.Ct. 2925, 69 L.Ed.2d 856 ("[T]he relevant provisions of the two statutes are in all material respects substantially identical .... [W]e therefore follow our established practice of citing interchangeably decisions interpreting the pertinent sections of the two statutes."); Permian Basin Area Rate Cases, 390 U.S. 747, 820-821, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); FPC v. Sierra Pacific Power Co., 350 U.S. 348, 353, 76 S.Ct. 368, 100 L.Ed. 388 (1956).
 
 
 [9]
 The Natural Gas Act provision states:
 The District Courts of the United States, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this Act or the rules, regulations, and orders thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of, this Act or any rule, regulation, or order thereunder.
 15 U.S.C. § 717u.
 
 
 [10]
 As California stresses, thePan American Court does state that the Natural Gas Act's exclusive jurisdiction provision is not a "generator of jurisdiction" beyond that otherwise arising under the Natural Gas Act. Pan American, 366 U.S. at 664, 81 S.Ct. 1303; see 28 U.S.C. § 1331. We feel bound, however, by Sparta's subsequent interpretation of language substantially identical to that contained within the FPA, and its conclusion that "the rule that state law claims cannot be alchemized into federal causes of action by incidental reference has no application when relief is partially predicated on a subject matter committed exclusively to federal jurisdiction." Sparta, 159 F.3d at 1212-13 (internal citation omitted).
 
 
 [11]
 Because we hold thatSparta controls, we do not reach the companies' other jurisdictional arguments under ARCO Envtl. Remediation v. Dep't of Health and Envtl. Quality, 213 F.3d 1108, 1114 (9th Cir.2000), and related cases.
 
 
 [12]
 We review de novo a party's claimed immunity under the Eleventh AmendmentCalifornia ex rel. Cal. Dep't of Toxic Substance Control v. Campbell, 138 F.3d 784, 786 (9th Cir.1998).
 
 
 [13]
 Section 2 provides:
 The judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority; — to all cases affecting ambassadors, other public ministers and consuls; — to all cases of admiralty and maritime jurisdiction; — to controversies to which the United States shall be a party; — to controversies between two or more states; — between a state and citizens of another state; — between citizens of different states; — between citizens of the same state claiming lands under grants of different states, and between a state, or the citizens thereof, and foreign states, citizens or subjects.
 U.S. CONST. art. III, § 2.
 
 
 [14]
 To the extent that California relies onThomas v. FAG Bearings Corp., 50 F.3d 502 (8th Cir.1995), for support, that case merely stands for the proposition that involuntary joinder of a State as a party to a litigation can violate Eleventh Amendment sovereign immunity.
 
 
 [15]
 California points to two district court opinions, which we deem unpersuasiveSee California v. Steelcase, Inc., 792 F.Supp. 84, 86 (C.D.Cal. 1992) (offering brief alternative holding that the Eleventh Amendment provides "immunity from being made an involuntary party to an action in federal court" and "should apply equally to the case where the state is a plaintiff in an action commenced in state court and the action is removed to federal court by the defendant."); Moore ex rel. Mississippi v. Abbott Lab., 900 F.Supp. 26, 30-31 (S.D.Miss.1995) (relying entirely upon Steelcase).
 
 
 [16]
 We review de novo the district court's Fed. R.Civ.P. 12(b)(6) dismissal,Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1035(9th Cir. 2002), including its analysis of preemption, Transmission Agency of California v. Sierra Pacific Power Co., 295 F.3d 918, 927-28 (9th Cir.2002), and the filed rate doctrine. Brown v. MCI WorldCom Network Servs., Inc., 277 F.3d 1166, 1169 (9th Cir.2002).
 
 
 [17]
 To the extent that California argues that application of its unfair competition laws merely represents anindirect intrusion into FERC's exclusive authority, Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 308, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988) ("Of course, every state statute that has some indirect effect on rates and facilities ... is not preempted."), rather than direct interference with that agency's ability to enforce the tariff, we are not persuaded. See generally N. Natural Gas Co. v. State Corp. Comm'n, 372 U.S. 84, 91, 83 S.Ct. 646, 9 L.Ed.2d 601 (1963) ("The federal regulatory scheme leaves no room either for direct state regulation of the prices of interstate wholesales of natural gas or for state regulations which would indirectly achieve the same result.") (citation omitted).
 
 
 [18]
 16 U.S.C. § 824e provides that upon a determination by FERC that "any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order." 16 U.S.C. § 824e
 
 
 [19]
 Even if California were correct that FERC has exclusive authority over wholesale rates, but not sales, we observe without deciding that the distinction appears to carry little weight on these facts. According to California, by failing to adhere to their tariff obligations to provide reserve energy capacity, the companies rendered the ISO incapable of maintaining the grid's stability by maintaining supply and demand. Thus its allegation goes directly to wholesale market activities
 
 
 [20]
 While California argues that its unfair competition laws extend broadly beyond mere regulation of interstate wholesale power rates, the fact that its claims are founded upon state laws of general applicability does not counsel against preemptionSee Duke Energy, 267 F.3d at 1056-59 (holding preemption by Cal. Gov't Code § 8572, a law of general applicability).
 
 
 [21]
 With respect to fraud, we note that we found persuasive inTANC the law of our sister circuits holding that procurement of a filed rate by fraud did not preclude filed rate preemption. See TANC, 295 F.3d at 933.
 
 
 [22]
 We note that proceedings are ongoing before FERC regarding much of the misconduct alleged in California's claimSee Order to Show Cause Concerning Gaming and/or Anomalous Market Behavior, 103 F.E.R.C. ¶ 61,345 (June 25, 2003).
 
 
 [23]
 Because we conclude that the FPA preempts the field, we do not separately address the question of conflict preemption
 
 
 [24]
 While the State concedes that the tariff prohibits double-selling of reserve capacity, it contends that restitution and disgorgement of the companies' ill-begot gains does not conflict with the filed tariff. But the tariff itself specifies the penalties to which companies are subject for violating their reserve capacity commitments
 
 
 [25]
 Nor does California's citation toArkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 582, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981) (hereinafter Arkla), require a different result. In Arkla, the court found a state contract claim to be preempted under the filed rate doctrine, concluding that "to permit parties to vary by private agreement the rates filed with the Commission would undercut the clear purpose of the congressional scheme: granting the Commission an opportunity in every case to judge the reasonableness of the rate." Id. While the Arkla Court did cite to Pan American, 366 U.S. at 656, 81 S.Ct. 1303, see Arkla, 453 U.S. at 582 n. 12, 101 S.Ct. 2925, as California notes, the singular reference to Pan American — at its core a case on jurisdiction, as discussed above, and one whose discussion of filed rate doctrine is limited — stands simply for the proposition that the filed rate doctrine does not abrogate all private contracts, such as those for refunds of charges in excess of, and not in conflict with, the filed rate. See Arkla, 453 U.S. at 582 n. 12, 101 S.Ct. 2925. Here, by contrast, California seeks "to alter the terms and conditions provided for in the tariff," Central Office, 524 U.S. at 229, 118 S.Ct. 1956 (Rehnquist, J., concurring), particularly with respect to remedies for non-compliance.